*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LOUIS JACKSON, MICHAEL C. BIRAC, LEE CRAFT, GAYLYNN CRAFT, RONALD HAYES, SMFJ, LLC, EVERTT HODGE, DONALD SWINNEY, STEFANIE BOYD, LISA SMITH, and KIRK BOYD,

        Plaintiffs-Appellants,

v

SOUTHFIELD NEIGHBORHOOD REVITALIZATION INITIATIVE, FRED ZORN, CITY OF SOUTHFIELD, KEN SIVER, OAKLAND COUNTY, and SOUTHFIELD NON-PROFIT HOUSING CORPORATION,

        Defendants-Appellees,

and

ETOILE LIBBETT, MICHAEL A. MANDELBAUM, SUSAN WARD WITKOWSKI, also known as SUSAN WARD and SUSAN WITKOWSKI, and GERALD WITKOWSKI,

        Defendants.

FOR PUBLICATION
September 21, 2023
9:20 a.m.

No. 361397
Oakland Circuit Court
LC No. 2018-162877-NZ

Before: GADOLA, P.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM.

-1-

In this putative class action regarding tax-foreclosure and sale procedures, plaintiffs appeal as of right the trial court's order granting summary disposition in favor of defendants[1] under MCR 2.116(C)(7) (dismissal of the action is warranted because of a prior judgment), (C)(8) (failure to state a claim on which relief could be granted), and (C)(10) (no genuine issue as to any material fact). We affirm in part, reverse in part, vacate in part, and remand to the trial court for further proceedings consistent with this opinion.

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

This case returns to us after our Supreme Court vacated the previous opinion of this Court and remanded the case to the trial court.[2] The lawsuit at issue arose out of much-litigated former provisions of the General Property Tax Act (GPTA), MCL 211.1 *et seq.*, which required the foreclosing governmental unit (FGU) to take title to real property to cover the cost of the unpaid tax debt and associated fees without compensating the owner for their equity in the property. This Court, in its previous opinion in this case, provided the following summary of the background facts:

> This case arises out of alleged irregularities in the tax-foreclosure sale procedures and later conveyances of tax-foreclosed properties. The named plaintiffs owned real property in the city of Southfield and were delinquent on their property taxes in 2012, 2013, and 2014. The Oakland County Treasurer began the tax-foreclosure process against those delinquent properties, as he was legally required to do under the [GPTA]. There is no dispute in this case that the Oakland County Treasurer complied with the notice requirements of the GPTA with respect to tax-foreclosure. In a separate action in the circuit court, a judgment of foreclosure was entered against plaintiffs' properties on February 8, 2017. The judgment noted that the right to redeem the properties by paying all applicable taxes, interest, and fees expired March 31, 2017. If not redeemed, the properties would vest title absolutely in the Oakland County Treasurer. [*Jackson v Southfield Neighborhood Revitalization Initiative*, unpublished per curiam opinion of the Court of Appeals, issued December 19, 2019 (Docket No. 344058), p 2, vacated 507 Mich 866 (2021).]

In that appeal, but not this one, Oakland County's payment-plan program was partially at issue. As relevant here, it is enough to note plaintiffs did not complete their payment plans, which would

---

[1] When plaintiffs amended their complaint after the remand from our Supreme Court, they removed Etoile Libbett, Michael A. Mandelbaum, Oakland County Treasurer, Andrew Meisner, Susan Ward Witkowski, and Gerald Witkowski as defendants. Therefore, this opinion will not address those parties, except where necessary for a full understanding of the case.

[2] *Jackson v Southfield Neighborhood Revitalization Initiative*, 507 Mich 886; 953 NW2d 402 (2021).

have allowed them to redeem their forfeited properties. *Id*. at 2-3. "Subsequently, the Oakland County Treasurer perfected title to the subject properties." *Id*. at 3.

In 2016 and 2017, the city began a process where it would exercise its right of first refusal under MCL 211.78m(1)[, as amended by 2014 PA 501,[3]] and purchase tax-foreclosed properties, from the Oakland County Treasurer, within the city limits, for the minimum bid. At the June 20, 2016 Southfield City Council meeting, defendant Zorn, who was the Southfield city administrator, made a recommendation for the counsel to enter into an agreement with defendant[] Southfield Non-Profit Housing Corporation (SNPHC). The agreement would require the city to exercise its statutory right of first refusal under [former] MCL 211.78m(1) for 45 properties that had been foreclosed and had title taken by the Oakland County Treasurer. Under the language of [former] MCL 211.78m(1), the city had the ability to purchase the tax-foreclosed properties "for a public purpose . . . by payment to the [FGU] of the minimum bid." The terms of the agreement between SNPHC and the city, as reflected in the meeting minutes, required SNPHC to "assume all costs in connection with the acquisition undertaken by the City from the Oakland County Treasurer regarding the 45 properties. . . ." Stated simply, SNPHC would be supplying money to the City of Southfield in order for the city to exercise its rights under [former] MCL 211.78m(1).

The minutes from the June 20, 2016 meeting further explain the proposed purpose behind the deal with SNPHC:

> The purpose of the acquisition is to rehabilitate and renovate these homes and then return them to productive use and purchase by individuals and families seeking housing opportunities within the City of Southfield. The program is designed to make available more owner-occupied housing opportunities within the City of Southfield and to revitalize and stabilize neighborhoods. In conjunction with the acquisition of these properties[,] the City intends to contract with [SNPHC], which will acquire the properties from the City, rehabilitate and renovate them, and, subsequently, make them available for purchase by financially qualified individuals and families. Staff has negotiated a contract with [SNPHC], pursuant to which [SNPHC] will accept title to the forty-five (45) 2016 tax-foreclosed properties from the City, renovate, repair, and rehabilitate the properties, and subsequently market them for sale to qualified individuals and families.

Defendant Zorn testified at the meeting that he and the city were concerned about individuals and companies purchasing tax-foreclosed properties for the sole purpose of turning them into rental properties. Defendant Zorn explained that

---

[3] As will be discussed in greater depth below, MCL 211.78m has since been amended, 2020 PA 255.

owners of rentals do not care for the properties in the same manner that owner-occupiers do. Thus, increasing the number of rentals in Southfield was causing blight and concerns regarding public safety and health.

Under the terms of the agreement, SNPHC would not only provide the funds for the city to exercise their right of first refusal, but would also pay for all fees and costs to rehabilitate the properties once title was transferred to SNPHC. Notably, defendant Zorn went on to testify that he was a board member and the vice president of SNPHC. Defendant Ken Siver, Southfield's mayor, was president of SNPHC and sat on the board of directors. . . . Following a vote, the recommendation was adopted by the Southfield City Council, and the agreement was formed between the city of Southfield and SNPHC on June 20, 2016.

On June 21, 2016, defendant, Southfield Neighborhood Revitalization Initiative (SNRI), was registered as a limited liability company (LLC) with the Department of Licensing and Regulatory Affairs (LARA). The document filed with LARA listed defendant Zorn as the resident agent for SNRI. On August 23, 2016, SNRI executed their "Operating Agreement," which reflected that the sole member of SNRI was SNPHC. Defendant Siver, as president of SNPHC, signed the Operating Agreement. The document also listed SNRI's "managers," which included defendant Zorn . . . .

The Operating Agreement also described SNRI's purpose as an organization:

> **1.3 Purpose (or Purposes).** [SNRI] has been formed for the purpose of purchasing tax foreclosed and other properties, improving such properties, selling such properties to persons of low and moderate income *when possible* and improving housing and homeownership opportunities in the City of Southfield. [SNRI] shall have all the powers necessary or convenient to effect any purpose for which it is formed, including all powers granted by the Act. [emphasis added.]

It is undisputed that the tax-foreclosed properties to which the Oakland County Treasurer gained title on March 31, 2016, were deeded to the city, and then to SNRI that same year. Throughout 2016 and 2017, the city used funds given to it from SNPHC to exercise its first refusal right to 101 properties. Once it obtained title to the properties by deed from the Oakland County Treasurer on July 31, 2017, the city conveyed the properties to SNRI via quitclaim deeds.

Once plaintiffs became aware that they no longer had title to their properties, the instant litigation was initiated against the Oakland County Treasurer and Andrew Meisner, who held the position of treasurer ("the treasury defendants"); the city, Siver, Zorn, [Michael A.] Mandelbaum, city attorney Susan Ward Witkowski, and Gerald Witkowski, who was the former code director for the city ("the city defendants"); and SNPHC, SNRI, and [Etoile] Libbett ("the private

-4-

defendants"). Plaintiffs made a wide array of allegations, including alleged violations of their constitutional rights to procedural due process, substantive due process, and equal protection. Plaintiffs also claimed that the actions of the governmental entities violated the Just Takings Clauses of the Michigan and United States Constitutions. In addition to those constitutional claims, plaintiffs also asserted claims for a violation of the GPTA, and civil damages under the Racketeer Influence and Corrupt Organizations Act (RICO), 18 USC 1961 *et seq*. Plaintiffs['] requested relief included damages for their lost equity in the properties (treble damages under the relevant portion of RICO), declaratory and injunctive relief, and to quiet title to their properties in their favor.

In lieu of responding to the complaint, defendants moved for summary disposition of all of plaintiffs' claims, and for sanctions. Defendants argued that plaintiffs' lawsuit was not permitted under the GPTA because it was an attempt to collaterally attack the judgment of foreclosure. Under the statutory scheme, having failed to timely redeem their properties or appeal the judgment, plaintiffs were limited in their available relief to a suit for damages arising out of a lack of any notice before the Court of Claims. Defendants further argued that plaintiffs were barred from asserting those claims under the doctrine of res judicata, plaintiffs lacked standing to bring the lawsuit considering their interest in the properties had been extinguished, and the trial court lacked jurisdiction to hear the lawsuit. Defendants made significant arguments that plaintiffs remaining claims, even if properly before the trial court, lacked legal and factual merit. For that same reason, defendants argued that plaintiffs' lawsuit was frivolous and defendants were entitled to sanctions in the form of attorney fees and costs.

The trial court agreed with defendants that it lacked jurisdiction to hear the lawsuit, plaintiffs lacked standing to bring it, and that res judicata barred the lawsuit, thereby summarily disposing of the entire complaint. Despite granting summary disposition in favor of defendants, the trial court denied their requests for sanctions, citing that plaintiffs' lawsuit, while unlikely to succeed, was not frivolous. [*Jackson*, unpub op at 3-6.]

Although not covered in the previous opinion, the trial court record also included evidence plaintiffs Ronald Hayes and SMFJ, LLC—along with other parties not associated with this case—sued the treasury defendants, Southfield, and SNRI in Oakland Circuit Court, LC No. 2017-157366-CZ. The lawsuit was a putative class action alleging the scheme described above was developed with the unconstitutional purpose of removing African-American homeowners from Southfield. As part of their relief requested, the plaintiffs sought the equity in their homes. The trial court granted summary disposition in favor of the defendants in that case and there was no appeal.

In this case, plaintiffs appealed the trial court's dismissal to this Court. Given that Oakland County satisfied the minimum requirements of procedural due process, this Court concluded plaintiffs no longer had legal standing to challenge the foreclosure, and the trial court did not have the jurisdiction to decide the issue. *Jackson*, unpub op at 7-9. The panel affirmed on that ground. *Id*. at 9-10. However, this Court disagreed with the trial court that the judgment of foreclosure

warranted dismissal of the claims on the basis of res judicata. *Id.* Plaintiffs applied for leave to appeal this Court's opinion to our Supreme Court. While the application was pending, our Supreme Court decided *Rafaeli, LLC v Oakland Co*, 505 Mich 429; 952 NW2d 434 (2020). The relevant facts and holdings of our Supreme Court's decision will be discussed in greater depth below, but as relevant at this point, the Court decided the following:

> We hold that [the] plaintiffs, former property owners whose properties were foreclosed and sold to satisfy delinquent real-property taxes, have a cognizable, vested property right to the surplus proceeds resulting from the tax-foreclosure sale of their properties. This right continued to exist even after fee simple title to [the] plaintiffs' properties vested with [the] defendants, and therefore, [the] defendants' retention and subsequent transfer of those proceeds into the county general fund amounted to a taking of [the] plaintiffs' properties under Article 10, § 2 of our 1963 Constitution. Therefore, [the] plaintiffs are entitled to just compensation, which in the context of a tax-foreclosure sale is commonly understood as the surplus proceeds. [*Rafaeli*, 505 Mich at 484-485.]

In response to our Supreme Court's decision in *Rafaeli*, on December 22, 2020, the Legislature amended the GPTA, 2020 PA 256, to create a method for property owners to "claim an interest in any applicable remaining proceeds from the transfer or sale of foreclosed property under [MCL 211.78m.]" MCL 211.78t(1). The amendment provided different processes for those property owners who had their interests foreclosed or sold after July 17, 2020, which was when the Court decided *Rafaeli*, and before July 18, 2020. MCL 211.78t(1)(a) and (b). In the present case, all of plaintiffs' properties were sold before July 18, 2020, so MCL 211.78t(1)(b) is relevant and states:

> (1) A claimant may submit a notice of intention to claim an interest in any applicable remaining proceeds from the transfer or sale of foreclosed property under section [MCL 211.78m], subject to the following:
>
> * * *
>
> (b) For foreclosed property transferred or sold under [MCL 211.78m] before July 18, 2020, both of the following:
>
> > (*i*) A claim may be made only if the Michigan supreme court orders that its decision in *Rafaeli*[, 505 Mich at 429], applies retroactively.
> >
> > (*ii*) Subject to subparagraph (*i*), the notice of intention must be submitted pursuant to subsection (6).

In addition to amending the GPTA to add MCL 211.78t, the Legislature also amended MCL 211.78m in a manner relevant to the present case, 2020 PA 255. Recall, as discussed above, that Southfield was able to purchase the subject properties without an auction and for the "minimum bid," because of its statutory right of first refusal provided in former MCL 211.78m(1). *Jackson*, unpub op at 3. While the new version of MCL 211.78m(1) still provided cities with the right of first refusal, the process was different if there were claimants for surplus proceeds under MCL 211.78t. Pertinently, in such a situation, a city "may purchase foreclosed property located

within that city . . . included in the judgment and subject to sale under this section by paying the [FGU] *the greater of* the minimum bid *or the fair market value of the property*." MCL 211.78m(1) (emphases added). The amendment of MCL 211.78m did not specifically address whether it should be applied prospectively or retrospectively.

Subsequently, on February 2, 2021, our Supreme Court entered an order in this case stating, "in lieu of granting leave to appeal, we VACATE the judgment of the Court of Appeals and we REMAND this case to the Oakland Circuit Court for reconsideration of the defendants' motions for summary disposition in light of *Rafaeli* [], 505 Mich 429 []." *Jackson*, 507 Mich at 866. Back before the trial court, plaintiffs amended their complaint with leave of the trial court. They pleaded three counts against Oakland County, but only two are relevant in this appeal. Pertinently, plaintiffs claimed Oakland County violated the Takings Clauses of the United States and Michigan Constitutions by taking their equity in their properties without just compensation.[4] Plaintiffs also brought an unjust-enrichment claim against SNRI; a civil-conspiracy claim under 42 USC 1983 against Southfield, SNRI, SNPHC, Zorn, and Siver; and a claim for declaratory relief against all defendants. As relevant to the present appeal, plaintiffs sought a declaration that *Rafaeli*, MCL 211.78m, and MCL 211.78t should all be given retroactive effect.

Defendants moved for summary disposition in lieu of answering the amended complaint. Oakland County argued *Rafaeli* should be given prospective-only application, and even if not, *Rafaeli* did not save plaintiffs' claims. Specifically, Oakland County noted *Rafaeli* stated the property owners' interest in the foreclosed lands were limited to the surplus from the tax-foreclosure sale maintained by the FGU. Here, Oakland County was the FGU and did not retain any surplus funds from plaintiffs' properties because they were sold to Southfield for the minimum bid. SNRI and SNPHC ("the corporate defendants," collectively) also moved for summary disposition, and reiterated Oakland County's arguments related to *Rafaeli*. After deciding *Rafaeli* was inapplicable to the case, the trial court was required to conclude that SNRI had done nothing wrong, and therefore, plaintiffs' unjust-enrichment claim must fail. Moreover, SNRI did not receive a direct benefit from plaintiffs, which was required for an unjust-enrichment claim. The corporate defendants additionally asserted the civil-conspiracy claim lacked merit because there was no underlying tort, which was required for such a claim. Alternatively, the corporate defendants argued Hayes's and SMFJ's claims were barred by the doctrine of res judicata because of their previous litigation.

Later, Southfield, Zorn, and Siver ("the city defendants," collectively), moved for summary disposition under MCR 2.116(C)(7) and (C)(8). The city defendants reiterated the arguments already made about application of *Rafaeli* to the case and the doctrine of res judicata with respect

---

[4] As an example, plaintiffs' representative, Louis Jackson, pleaded the following:

> Plaintiff Louis Jackson had a Tax Delinquency of $34,161. On July 31, 2017, Oakland transferred the property to Southfield, which paid the minimum amount due under [former] MCL § 211.78m. On September 13, 2017, the property was conveyed by quit claim deed from Southfield to SNRI for $1.00. The property was valued in excess of $225,000 at that time, resulting in the loss of over $190,000 of Equity.

to Hayes and SMFJ. As to the civil-conspiracy claim under 42 USC 1983, the city defendants argued Zorn and Siver were entitled to qualified immunity. Additionally, the claim failed as to all parties because, given the limitation stated in *Rafaeli*, plaintiffs had not pleaded an underlying constitutional violation. The city defendants urged the trial court to hold the amended version MCL 211.78m should only be given prospective application.

Plaintiffs responded to the three motions for summary disposition, arguing defendants were attempting to improperly limit the holding of *Rafaeli*. Plaintiffs insisted the Court in *Rafaeli* did not rule out cases like this one, where the government bypassed a foreclosure sale, sold properties for the minimum bid, and thereby eliminated the possibility of any excess proceeds from a sale. Further, plaintiffs asserted *Rafaeli* should be given retroactive effect, as is the general rule for decisions of our Supreme Court. As to the civil-conspiracy claim, plaintiffs noted that, under 42 USC 1983, such a claim requires only an underlying constitutional violation, which plaintiffs satisfied by pleading a violation of the Takings Clause of the United States Constitution. With respect to retroactive application of MCL 211.78m, plaintiffs argued the amendment of MCL 211.78t made clear the Legislature intended the amendments to be given retroactive effect if our Supreme Court's decision in *Rafaeli* was given retroactive effect. Plaintiffs encouraged the trial court to do both of those things. Plaintiffs contended Zorn and Siver were not entitled to summary disposition on the basis of qualified immunity because they violated a clearly established constitutional right. The unjust-enrichment claim should survive summary disposition, plaintiffs insisted, because SNRI received a benefit from plaintiffs via an intermediary, which was enough under applicable caselaw. Lastly, plaintiffs asserted res judicata did not apply to Hayes's and SMJF's claims because they did not and could not have brought the same claims in their previous litigation.

One day after plaintiffs filed their response briefs, on January 6, 2022, this Court released its opinion in *Proctor v Saginaw Co Bd of Comm'rs*, 340 Mich App 1; 985 NW2d 193 (2022). As relevant to the present case, this Court held "that *Rafaeli*, . . . should be applied to pending cases, such as those of the named plaintiffs, in which a challenge has been raised and preserved." *Proctor*, 340 Mich App at 23. In other words, the *Proctor* Court stated *Rafaeli* was to be given, at least, partial retroactive effect. This Court in *Proctor* also reiterated the holding in *Rafaeli* related to surplus proceeds from a tax-foreclosure sale: " 'We reject the premise that just compensation requires that plaintiffs be awarded the fair market value of their properties so as to be put in as good of position had their properties not been taken at all.' " *Proctor*, 340 Mich App at 28, quoting *Rafaeli*, 505 Mich at 483.

In defendants' reply briefs filed after *Proctor* was issued, defendants relied on the second holding in the decision and argued it barred plaintiffs' claims in the present case because there were no surplus proceeds from a tax-foreclosure sale. Because there was no unjust-takings claim under the facts presented in this case, defendants argued that all of plaintiffs' derivative claims similarly lacked merit. During oral arguments regarding the motions for summary disposition, plaintiffs took their opportunity to address *Proctor*. Plaintiffs initially noted the *Proctor* decision clearly meant *Rafaeli* applied to the present case to the extent it created a cause of action for an unjust taking as a result of a tax-foreclosure sale. As for the second holding in *Proctor*, plaintiffs reiterated their belief that the facts of *Rafaeli* rendered it distinguishable from the present case. Briefly, because there were no foreclosure sales at a public auction in the present case, the limitation in *Rafaeli* regarding surplus proceeds did not apply here.

After taking the issues under advisement, the trial court granted defendants' motions for summary disposition and provided the following reasoning:

> As an initial matter, the Court finds that the Supreme Court has not declared *Rafaeli* retroactive and the lack of retroactive language in MCL 211.78m indicates a lack of intent for retroactive application by the Legislature. *Rafaeli* clarified the extent of the property interest available to Plaintiffs post-foreclosure and limited it to excess proceeds from a tax foreclosure sale. In the instant case, Plaintiffs have failed to identify a property interest that was taken from them. The Federal Constitutional claims raised by Plaintiffs have been routinely rejected by Federal Courts post *Rafaeli*. Plaintiffs' claims of unjust enrichment and civil conspiracy are without merit because there has been no unlawful or unjust conduct warranting restitution. The claims of Plaintiffs Hayes and SMFJ are barred by res judicata because they arise from the same core set of facts related to the foreclosure and transfer of their former properties and could have been raised in the previous lawsuit.

Plaintiffs moved the trial court to reconsider its decision because it seemingly ignored this Court's decision in *Proctor*. After ordering defendants to respond and considering those responses, the trial court denied plaintiffs' motion for reconsideration. This appeal followed.

## II. RETROACTIVE APPLICATION OF *RAFAELI*

Plaintiffs argue the trial court erred when it refused to retroactively apply *Rafaeli* to the present case. Given that there is binding precedent on exactly this question, we agree.

"Whether a judicial decision applies retroactively is a question that this Court reviews de novo." *Jawad A Shah, MD, PC v State Farm Mut Auto Ins Co*, 324 Mich App 182, 191; 920 NW2d 148 (2018). "The general rule is that judicial decisions are to be given complete retroactive effect." *Michigan Educ Employees Mut Ins Co v Morris*, 460 Mich 180, 189; 596 NW2d 142 (1999) (quotation marks, citation, and alterations omitted). However, "a more flexible approach is warranted where injustice might result from full retroactivity." *Schafer v Kent Co*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 356908); slip op at 3 (quotation marks and citation omitted). Stated differently, "[p]rospective application of a judicial decision is a departure from the general rule and is only appropriate in exigent circumstances." *Proctor*, 340 Mich App 21 (quotation marks and citation omitted). "Our Supreme Court has held that prospective application of a judicial decision 'is appropriate when the holding overrules settled precedent or decides an issue of first impression whose resolution was not clearly foreshadowed.' " *Schafer*, ___ Mich App at ___; slip op at 3-4, quoting *Lindsey v Harper Hosp*, 455 Mich 56, 68; 564 NW2d 861 (1997), superseded by statute on other grounds by MCL 700.2121 *et seq.*

Consequently, "[t]he threshold question in determining the application of a new decision is whether the decision in fact clearly established a new principle of law." *Proctor*, 340 Mich App at 21 (quotation marks and citation omitted). When the threshold question is answered in the affirmative, prospective application still is not guaranteed, because this Court must consider "whether it is still appropriate to apply the judicial decision retroactively by analyzing the following three factors: '(1) the purpose to be served by the new rule, (2) the extent of reliance on

the old rule, and (3) the effect of retroactivity on the administration of justice.' " *Schafer*, ___ Mich App at ___; slip op at 4, quoting *Pohutski v City of Allen Park*, 465 Mich 675, 696; 641 NW2d 219 (2002).

As argued by plaintiffs, we need not engage in analysis of these rules regarding retroactivity because this Court has already done so in published, and therefore binding, opinions. Initially, in *Proctor*, 340 Mich App at 26-27, this Court held "our Supreme Court has indicated its intent that *Rafaeli* be applied to cases in which the parties" had raised and preserved a similar challenge before the *Rafaeli* decision was released. The panel in *Proctor*, 340 Mich App at 25-26, was presented with a case like the present one, where the plaintiffs raised challenges to the clauses in the GPTA that allowed an FGU to keep the surplus proceeds from a tax-foreclosure sale of their real property before the Court decided *Rafaeli*. Consequently, the decision in *Proctor*, 340 Mich App at 26-27, on its own, was determinative of the issue of whether *Rafaeli* should be applied in the present case, because plaintiffs raised a similar argument at a similar time.

To the extent there was any doubt about applying *Rafaeli* retroactively, this Court recently went one step further and held: "To remove uncertainty, we hold *Rafaeli* did not announce a new rule of law but returned the law to that which was recognized at common law and by the ratifiers of the Michigan Constitution of 1963, see *Rafaeli*, 505 Mich at 472, and should be given full retroactive effect." *Schafer*, ___ Mich App at ___; slip op at 5. The published opinions in *Schafer* and *Proctor* have "precedential effect under the rule of stare decisis." MCR 7.215(C)(2). Indeed, in an even more recent decision questioning whether *Rafaeli* should be applied retroactively, this Court stated: "Both *Proctor* and *Schafer* have applications for leave to appeal pending in our Supreme Court;[5] unless and until the Court determines the issue of *Rafaeli*'s retroactivity, *Schafer* conclusively resolves this issue, and we will not revisit it." *Breiner v Michigan*, ___ Mich App ___, ___ n ___; ___ NW2d ___ (2022) (Docket Nos. 356501 and 356850); slip op at 11 n 6. Briefly, then, we are bound by the decisions in *Proctor*, 340 Mich App at 26-27, and *Schafer*, ___ Mich App at ___; slip op at 5, to apply *Rafaeli* retroactively. The trial court was similarly bound by *Proctor*, 340 Mich App at 26-27, at least, which had been released when the trial court entered its order granting summary disposition in favor of defendants. To the extent the trial court declined to retroactively apply *Rafaeli*, it erred.

## III. FEDERAL TAKINGS CLAUSE

Plaintiffs contend the trial court improperly concluded the United States Constitution failed to recognize a protected property interest in the equity plaintiffs had in their homes. We agree.

---

[5] The application for leave to appeal in *Schafer* has since been granted by our Supreme Court, *Schafer v Kent Co*, ___ Mich ___; 990 NW2d 876 (2023). However, this does not change the precedential nature of the *Schafer* opinion because MCR 7.215(C)(2) (emphasis added) specifically states: "The filing of an application for leave to appeal in the Supreme Court *or a Supreme Court order granting leave to appeal* does not diminish the precedential effect of a published opinion of the Court of Appeals."

## A. STANDARD OF REVIEW

As noted above, "[w]hether a judicial decision applies retroactively is a question that this Court reviews de novo." *Jawad A Shah, MD, PC*, 324 Mich App at 191. In this issue, plaintiffs also contend the trial court erred when it granted summary disposition in favor of Oakland County as related to plaintiffs' federal takings claims. The trial court order indicated it was entered under MCR 2.116(C)(7), (C)(8), and (C)(10). However, because the arguments focus solely on whether plaintiffs pleaded legally cognizable unjust-takings claims under the United States Constitution, the summary-disposition order with respect to this issue is properly considered under MCR 2.116(C)(8).

> We review de novo a circuit court's summary disposition decision. *Dalley v Dykema Gossett PLLC*, 287 Mich App 296, 304; 788 NW2d 679 (2010). "A court may grant summary disposition under MCR 2.116(C)(8) if the opposing party has failed to state a claim on which relief can be granted." *Id.* (quotation marks and brackets omitted). "A motion brought under subrule (C)(8) tests the legal sufficiency of the complaint solely on the basis of the pleadings." *Id.* (citation omitted). All well-pleaded factual allegations are accepted as true and construed in a light most favorable to the nonmoving party. *Id.* at 304-305. "Summary disposition on the basis of subrule (C)(8) should be granted only when the claim is so clearly unenforceable as a matter of law that no factual development could possibly justify a right of recovery." *Id.* at 305 (quotation marks and citation omitted). [*Nyman v Thomson Reuters Holdings, Inc*, 329 Mich App 539, 543; 942 NW2d 696 (2019).]

Michigan appellate courts "also review de novo questions of constitutional law." *Bauserman v Unemployment Ins Agency*, 509 Mich 673, 686-687; 983 NW2d 855 (2022).

## B. APPLICABLE LAW AND ANALYSIS

The trial court erred when it granted Oakland County's motion for summary disposition of plaintiffs' claims under the Takings Clause of the United States Constitution.

"The United States Constitution precludes the federal government from taking private property unless it is taken for a public use and with just compensation." *Blue Harvest, Inc v Dep't of Transp*, 288 Mich App 267, 277; 792 NW2d 798 (2010), citing US Const, Am V. "That prohibition, of course, applies against the States through the Fourteenth Amendment." *Webb's Fabulous Pharmacies, Inc v Beckwith*, 449 US 155, 160; 101 S Ct 446; 66 L Ed 2d 358 (1980). "Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.' " *Phillips v Washington Legal Foundation*, 524 US 156, 164; 118 S Ct 1925; 141 L Ed 2d 174 (1998), quoting *Bd of Regents of State Colleges v Roth*, 408 US 564, 577; 92 S Ct 2701; 33 L Ed 2d 548 (1972). However, the United States Supreme Court has been clear that " 'a State, by *ipse dixit*, may not transform private property into public property without compensation' simply by legislatively abrogating [a] traditional rule" regarding recognized property rights. *Phillips*, 524 US at 167, quoting *Webb's Fabulous Pharmacies*, 449 US at 164. "In other words, at least as to confiscatory regulations (as opposed to those regulating

-11-

the use of property), a State may not sidestep the Takings Clause by disavowing traditional property interests long recognized under state law." *Phillips*, 524 US at 167.

In *Hall v Meisner*, 51 F4th 185, 189-190 (CA 6, 2022), the Sixth Circuit considered the Takings Clause of the United States Constitution and the above-cited federal caselaw in the context of the exact scheme contemplated in this case:

> In February 2018, per the [GPTA], Oakland County foreclosed on the home of Tawanda Hall to collect a tax delinquency (meaning, as used here, the outstanding taxes, interest, penalties, and fees) of $22,642; [Oakland] County then conveyed the property to the City of Southfield for that same amount. [Southfield] in turn conveyed the property for $1 to a for-profit entity, [SNRI], which later sold it for $308,000. Pursuant to that same process, in February 2016, [Oakland] County foreclosed on the home of Curtis and Coretha Lee for a tax delinquency of $30,547; after the same series of conveyances, [SNRI] sold it for $155,000. [Oakland] County likewise foreclosed on the home of Kristina Govan for a tax delinquency of $43,350; [SNRI] (after the same conveyances) still holds title to the property. [*Hall*, 51 F4th at 188-189.]

The plaintiffs in *Hall* sued Oakland County, Southfield, SNRI, and "certain officers of each," asserting "claims under the Takings Clause of the Fifth Amendment (as applied to the states pursuant to the Fourteenth), along with various other federal and state claims." *Id*. at 189. The United States District Court for the Eastern District of Michigan dismissed those claims at the summary-judgment phase of the litigation, relying primarily on our Supreme Court's decision in *Rafaeli*, 505 Mich at 462. *Hall*, 51 F4th at 189. The defendants in *Hall* made many of the same arguments that defendants raise in the present case about whether *Rafaeli* applies to the facts of this case. In dismissing the plaintiffs' action, the district court agreed with the defendants' interpretation of *Rafaeli*, as explained by the Sixth Circuit:

> The district court, for its part, disagreed [with the plaintiffs] in a carefully reasoned opinion. Specifically, the court held that, in the event of foreclosure, the former property owner has a property right only to any surplus proceeds (meaning proceeds in excess of the tax delinquency) obtained by the "foreclosing governmental unit" after a foreclosure sale—if in fact there was one. For that proposition the court relied upon the Michigan Supreme Court's opinion in *Rafaeli*, which arguably said as much, albeit in dictum. *See* 505 Mich. at 462. And here the foreclosing governmental unit—[Oakland] County—had not obtained any surplus at all from its disposition of the plaintiffs' homes, because it conveyed them (to the City of Southfield) for merely the amounts of their tax delinquencies. [*Hall*, 51 F4th at 189.]

The Sixth Circuit disagreed with the district court's analysis, noting the district court's reading of *Rafaeli* was overly broad and would improperly permit Michigan to " 'sidestep the Takings Clause by disavowing traditional property interests long recognized under state law.' " *Hall*, 51 F4th at 190, quoting *Phillips*, 524 US at 167. When considering whether Michigan law recognized an equitable interest in real property, the Sixth Circuit began its survey in the 1100s in England, when a lender, or mortgagee, was permitted to take land when the entire sum owed was

not paid by the debtor, or mortgagor, on a specific day referenced in the mortgage, known then as "the law day." *Hall*, 51 F4th at 190-191. "But irrevocable forfeiture of the debtor's entire interest in the land, no matter what the reason for the borrower's failure to pay on the law day—for example if, on that day, the lender was nowhere to be found—was before long regarded as an intolerably harsh sanction for the borrower's default." *Id*. at 191. When the common law failed to provide for a more tolerable result, England's court of equity, the Court of Chancery, stepped in to fill the gaps. *Id*. By the 1600s and 1700s, the Court of Chancery acknowledged a borrower's "equitable interest in the land," and, in an effort to "vindicate that interest, the Court of Chancery recognized the mortgagor's 'Equity of Redemption[,]' which allowed him to regain legal title to the land by repayment of the amount due even after the law day." *Id*. (alteration in original). In 1759, a preeminent English jurist, Lord Mansfield, stated a borrower's equitable interest in real property was an established property right that "could be devised or conveyed like any other interest in property." *Id*. 191-192.

"Yet the Court of Chancery also recognized, at least nominally, the lender's right to foreclose upon the land." *Id*. at 192. Initially, the Court of Chancery permitted a "strict foreclosure," which "would extinguish the landowner's equitable interest in the property and grant the lender full ownership of land whose value might far exceed the amount of the unpaid debt." *Id*. "And even when the Court of Chancery granted a decree of strict foreclosure, it remained open to vacatur years later if the landowner filed a petition to that effect." *Id*. In the 1800s, American courts began to consider these same issues and "were uniformly hostile to strict foreclosure in cases—like this one—where the land's value exceeded the amount of the debt." *Id*. As early as 1827, the highest equitable court in New York "opined that, in cases where 'the mortgaged premises exceed the amount of the debt in value,' strict foreclosure would be 'unconscionable[.]' " *Id*., quoting *Lansing v Goelet*, 9 Cow 346, 355 (NY, 1827) (alteration in *Hall*). The Sixth Circuit noted the same ideal had been recognized in 1215, with the signing of the Magna Carta, which "provided that a debtor's lands could be taken only to the extent necessary to satisfy the debt." *Hall*, 51 F4th at 193. The American courts' solution to this problem was " 'development of foreclosure by *sale* (with the surplus over the debt refunded to the debtor) as a means of avoiding the draconian consequences of strict foreclosure.' " *Id*., quoting *BFP v Resolution Trust Corp*, 511 US 531, 541; 114 S Ct 1757; 128 L Ed 2d 556 (1994) (emphasis added in *Hall*).

Further, these property rights did not exist solely in the context of mortgages, as the Sixth Circuit noted, but instead "extended fully to foreclosures for payment of unpaid taxes." *Hall*, 51 F4th at 193. "Indeed—given the absence of any agreement by the landowner (as with a mortgage) to forfeit the land upon default—the foreclosure remedy was more limited in tax cases." *Id*. To support this statement, the Sixth Circuit cited to a decision of the United States Supreme Court from 1808, in which it "held that a tax collector had 'unquestionably exceeded his authority' when he had sold more land than 'necessary to pay the tax in arrear.' " *Id*., quoting *Stead's Executors v Course*, 8 US 403, 414; 4 Cranch 403; 2 L Ed 660 (1808). The reason selling more property than necessary to pay the tax debt was improper, the Sixth Circuit reasoned, is because the property owner retained equitable title to the property, which "was an interest in property like any other." *Hall*, 51 F4th at 194. "To extinguish the equitable title of the debtor, the creditor was required" to obtain an order of foreclosure and sell the property at a public sale. *Id*. (quotation marks and citation omitted). Even then, "[u]nder those same long-settled principles, the debtor would then be entitled to any surplus proceeds from the sale, which represented the value of the equitable title thus extinguished." *Id*., citing *Bronson v Kinzie*, 42 US (1 How) 311, 318; 11 L Ed 143 (1843).

The Sixth Circuit then turned to the issue presented to it, which was whether the GPTA violated the longstanding property rights discussed above. *Hall*, 51 F4th at 194. The Sixth Circuit ruled the GPTA was unconstitutional to the extent it allowed Oakland County to take absolute title to the plaintiffs' properties without paying them for their equitable interests therein:

> Michigan law flatly contravened all these long-settled principles when it allowed Oakland County to take "absolute title" to the plaintiffs' homes as payment for their tax delinquencies. M.C.L. § 211.78k(6). By taking absolute title to the plaintiffs' property, [Oakland] County took their equitable titles; and [Oakland] County did so without a public foreclosure sale and without payment to the plaintiffs for the value of those titles. [Oakland] County's foreclosure of these properties was thus nothing less than a strict foreclosure—a practice that English courts had steadfastly prevented as far back as the 1600s and that American courts (not least Michigan ones) effectively eradicated as "unconscionable" and "draconian" some 200 years ago. *Lansing*, 9 Cow. at 355; *Resolution Trust Corp.*, 511 U.S. at 541. [Oakland] County took the plaintiffs' equitable titles without paying for them simply because the [GPTA] said it could. Thus—by that *ipse dixit*—the Act "sidestep[ped] the Takings Clause by disavowing traditional property interests long recognized under state law." *Phillips*, 524 U.S. at 167. [*Hall*, 51 F4th at 194.]

The Sixth Circuit noted this attempt by Michigan to divest individuals of their equitable interest in property was an aberration even in Michigan itself, citing cases where Michigan appellate courts recognized equitable interests held by those in situations involving land-sale contracts, "timber and mineral rights," and the distribution of "marital assets in a divorce proceeding." *Id.* at 194-195, citing *Graves v American Acceptance Mortg Corp*, 469 Mich 608, 615; 677 NW2d 829 (2004); *City of Marquette v Mich Iron & Land Co*, 132 Mich 130, 132; 92 NW 934 (1903); *In re $55,336.17 Surplus Funds*, 319 Mich App 501, 508-509; 902 NW2d 422 (2017); *Reeves v Reeves*, 226 Mich App 490, 493; 575 NW2d 1 (1997); *Stevens Mineral Co v Michigan*, 164 Mich App 692; 418 NW2d 130 (1987).

As indicated above, the Sixth Circuit did not believe our Supreme Court's decision in *Rafaeli* should be read so broadly as to preclude the plaintiffs' action when there were no surplus proceeds from a tax-foreclosure sale because a public sale never occurred. *Hall*, 51 F4th at 195. The Sixth Circuit reasoned the *right* to surplus proceeds from a public tax-foreclosure sale recognized in *Rafaeli* arose from the protected property interest an owner has in their equitable title, stating:

> The defendants, for their part, insist throughout their briefing that, under Michigan law, a homeowner's equitable interest in her property is limited to any "surplus" proceeds after a foreclosure sale conducted by the "foreclosing governmental unit." *See Rafaeli*, 505 Mich. at 462. (Of which there were none here, because there was no public foreclosure sale.) But that proposition, as shown above, overlooks the very reasons *why* a property owner has a right to the surplus. That right does not arise in manner akin to quantum mechanics, materializing suddenly without any apparent connection to anything that existed before. The owner's right to a surplus after a foreclosure sale instead follows directly from her

possession of equitable title before the sale. The surplus is merely the embodiment in money of the value of that equitable title. [*Hall*, 51 F4th at 195.]

The Sixth Circuit concluded by opining: "On the facts alleged here, [Oakland] County took the plaintiffs' property without just compensation, in violation of the Takings Clause." *Id*. at 196.

From this summary of *Hall*, it is plain the Sixth Circuit's decision is particularly troubling for Oakland County in the present case. Indeed, although plaintiffs raised federal takings claims before the decision in *Hall*, they effectively have relied solely on application of that case in the present appeal. To avoid its application, Oakland County argues this Court should either conclude *Hall* applies prospectively only or was wrongly decided and, thus, should not be followed by this Court. Addressing each in turn, Oakland County's argument with regard to retroactivity are the same arguments it raised when insisting *Rafaeli* should not be applied in this case. Pertinently, Oakland County claims *Hall* announced a new rule of law, it could not have been foreseen, placed an extra duty on Oakland County that did not previously exist, and would cause injustice to Oakland County.

As discussed above, the general rule regarding judicial opinions is that they are to have retroactive effect. *Michigan Educ Employees Mut Ins Co*, 460 Mich at 189. Stated differently, "[p]rospective application of a judicial decision is a departure from the general rule and is only appropriate in exigent circumstances." *Proctor*, 340 Mich App 21 (quotation marks and citation omitted). "The threshold question in determining the application of a new decision is whether the decision in fact clearly established a new principle of law." *Id*. (quotation marks and citation omitted). When the threshold question is answered in the affirmative, this Court must consider "whether it is still appropriate to apply the judicial decision retroactively by analyzing the following three factors: '(1) the purpose to be served by the new rule, (2) the extent of reliance on the old rule, and (3) the effect of retroactivity on the administration of justice.' " *Schafer*, ___ Mich App at ___; slip op at 4, quoting *Pohutski*, 465 Mich at 696.

According to the above-cited caselaw, the first question to consider is whether *Hall* "in fact clearly established a new principle of law." *Proctor*, 340 Mich App at 21 (quotation marks and citation omitted). It is difficult to see how one could read the opinion in *Hall* and determine it was announcing a *new* principle of law. Indeed, the Sixth Circuit surveyed the law regarding whether an individual had an equitable interest in real property protected from seizure by creditors dating back to the 1100s in England. According to the Sixth Circuit's analysis, courts of equity have practically never approved of a creditor taking absolute and irredeemable title to real property to satisfy a debt worth less than the value of the property. Instead, such actions were identified as being improper in the Magna Carta in 1215, by the Court of Chancery thereafter, and by American courts when the issue was considered as early as 1827. An equitable interest in real property over the amount of a debt, then, was a recognized property right under the Takings Clause of the United States Constitution long before the GPTA was legislated. Consequently, in ruling that Oakland County violated the federal constitution by taking equitable interest in real property without just compensation, the Sixth Circuit was restoring the plaintiffs' property rights that had existed for hundreds of years.

Notably, our Supreme Court performed a similar review of the history of the law when deciding *Rafaeli*, 505 Mich at 456-470. After doing so, the Court concluded "our 1963

Constitution protects a former owner's property right to collect the surplus proceeds following a tax-foreclosure sale under Article 10, § 2." *Rafaeli*, 505 Mich at 473. When addressing whether *Rafaeli* should be applied retroactively, this Court noted it must first consider the threshold question of whether "the decision in fact clearly established a new principle of law." *Proctor*, 340 Mich App at 21 (quotation marks and citation omitted). The *Proctor* Court answered the question in the negative, stating "we do not conclude that our Supreme Court in *Rafaeli* overruled clear and uncontradicted caselaw or specifically announced a new rule that at least had not been previously foreshadowed." *Proctor*, 340 Mich App at 23. "Therefore, because this Court determined in *Proctor* that this threshold question is not satisfied, then full retroactive application of *Rafaeli* is appropriate." *Schafer*, ___ Mich App at ___ n ___; slip op at 6 n 3.

Oakland County has provided no reason why the same logic would not apply with respect to *Hall*, 51 F4th at 190-194, which conducted a substantially similar discussion of the same general ideas presented in *Rafaeli*. The Sixth Circuit in *Hall* did not overrule "clear and uncontradicted caselaw or specifically announce[] a new rule that at least had not been previously foreshadowed." *Proctor*, 340 Mich App at 23. Consequently, the threshold question we must consider when determining whether a judicial opinion should be given retroactive effect has been answered in the negative. *Id.* Upon such a conclusion, full retroactive application is appropriate. *Schafer*, ___ Mich App at ___ n ___; slip op at 6 n 3. Thus, Oakland County's attempt to escape the holding in *Hall*, 51 F4th at 196, on the basis of retroactivity lacks merit.

As noted, Oakland County also argues *Hall* was incorrectly decided and should not be followed by this Court. Inherent in this argument is that we are "not bound by decisions of any lower federal courts, because '[a]lthough lower federal court decisions may be persuasive, they are not binding on state courts[.]' " *Bienenstock & Assoc, Inc v Lowry*, 314 Mich App 508, 515; 887 NW2d 237 (2016), quoting *Abela v Gen Motors Corp*, 469 Mich 603, 606-607; 677 NW2d 325 (2004). While such is true, it is also true that "[w]ith regard to issues involving federal law, this Court *is* bound by decisions of the United States Supreme Court . . . ." *Bienenstock & Assoc*, 314 Mich App at 515 (emphasis added). In its briefing, Oakland County insists *Hall* was wrongly decided on the basis of a longstanding precedent of the United States Supreme Court. Indeed, Oakland County asserted with confidence the Supreme Court would reverse *Hall*. However, on June 20, 2023, the Supreme Court denied Oakland County's petition for writ of certiorari. *Meisner v Hall*, ___ US ___; ___ S Ct ___; ___ L Ed 2d ___ (2023) (No. 22-874). In addition to denying certiorari with respect to *Hall*, the Supreme Court quoted *Hall* in a recent opinion when discussing how property rights are defined, along with references to state law, under the Takings Clause of the United States Constitution:

> But state law cannot be the only source. Otherwise, a State could "sidestep the Takings Clause by disavowing traditional property interests" in assets it wishes to appropriate. *Phillips*, 524 U.S., at 167; see also *Webb's Fabulous Pharmacies* [], 449 U.S. [at] 164 []; *Hall* [], 51 F.4th [at] 190 (Kethledge, J., for the Court) ("[T]he Takings Clause would be a dead letter if a state could simply exclude from its definition of property any interest that the state wished to take."). [*Tyler v Hennepin Co, Minn*, 598 US 631, 638; 143 S Ct 1369; 215 L Ed 2d 564 (2023).]

While the Supreme Court's citation to and quotation of *Hall* certainly should not be considered a validation of all of its holdings, the *Tyler* opinion also impliedly adopted the reasoning

-16-

in *Hall* as it related to a property owner's equitable interest after tax foreclosure. *Tyler*, 598 US at 642-643. Most relevantly, the Supreme Court in *Tyler* discussed its previous decision in *United States v Lawton*, 110 US 146; 3 S Ct 545; 28 L Ed 100 (1884). The Supreme Court described the case and its rulings in the following manner:

> The property owner [in *Lawton*] had an unpaid tax bill under the 1862 Act for $170.50. [*Lawton*, 110 US at 148]. The Federal Government seized the taxpayer's property and, instead of selling it to a private buyer, kept the property for itself at a value of $1100. *Ibid*. The property owner sought to recover the excess value from the Government, but the Government refused. *Ibid*. The 1861 Act explicitly provided that any surplus from tax sales to private parties had to be returned to the owner, but it did not mention paying the property owner the excess value where the Government kept the property for its own use instead of selling it. See 12 Stat. 304. We held that the taxpayer was still entitled to the surplus under the statute, just as if the Government had sold the property. *Lawton*, 110 U.S., at 149-150. Though the 1861 statute did not explicitly provide the right to the surplus under such circumstances, "[t]o withhold the surplus from the owner would be to violate the Fifth Amendment to the Constitution and to deprive him of his property without due process of law, or to take his property for public use without just compensation." *Id*., at 150. [*Tyler*, 598 US at 643.]

In discussing *Lawton*, the Supreme Court recognized the situation was slightly different than a case where there was a tax-foreclosure sale. *Id*. When the Supreme Court turned to its explanation of *Lawton*, it had just referenced an earlier decision involving excess proceeds from a tax-foreclosure sale. *Id*. at 642, citing *United States v Taylor*, 104 US 216, 218-219; 26 L Ed 721 (1881). The Supreme Court then described *Lawton*, 110 US at 149-150, as "extend[ing] a taxpayer's right to surplus even further" than the actual proceeds from a tax-foreclosure sale. *Tyler*, 598 US at 643.

Although the Supreme Court in *Tyler* was considering a case involving surplus proceeds from tax-foreclosure sales, it also stated an unjust taking occurs under the federal constitution when the government keeps the entire property itself instead of holding a tax-foreclosure sale. *Id*., citing *Lawton*, 110 US at 149-150. In *Lawton*, the Supreme Court noted the government took title to the entire property subject to a tax debt and associated fees of $170.50. *Lawton*, 110 US at 149. Because the property was "purchased" by the taxing authority, "no money was paid on the sale." *Id*. Instead, the entire property was retained by the United States, and the Supreme Court noted the property was valued at $1,100.[6] *Lawton*, 110 US at 149. Despite there being no actual

---

[6] The opinion does not state exactly how this value was calculated. Instead, the Supreme Court stated, "[t]he land in the present case [was] 'struck off for' and 'bid in' for the United States at the sum of $1,100 . . . ." *Lawton*, 110 US at 149. It would be reasonable to assume such was the assessed value of the property at issue, but again, the Supreme Court never specifically stated it was. *Id*. The Supreme Court in *Tyler*, 598 US at 643, explained it as the United States keeping "the property for itself at a value of $1100." Interestingly, our Supreme Court discussed *Lawton*

proceeds, the Supreme Court determined the $929.50 difference between the value of the property and tax delinquency (including associated costs and fees), must be treated "in like manner as if it were the surplus of purchase money received by the United States from a third person on a sale of the land to such person for the non-payment of the tax." *Id*. at 149-150. Thus, the Supreme Court in *Lawton* effectively stated a property owner has an equitable interest in the value of their property above the tax debt and associated fees, even when a tax-foreclosure sale does not occur. *Id*. This was, at least, how the Supreme Court interpreted *Lawton* when deciding *Tyler*, 598 US at 643 ("We held that the taxpayer was still entitled to the surplus under the statute, just as if the Government had sold the property.").

In light of these cases, Oakland County's argument that *Hall* was wrongly decided has lost nearly all of the minimal weight it carried at the time Oakland County raised it. Pertinently, since Oakland County filed its brief, the United States Supreme Court denied certiorari in *Hall*, cited and quoted *Hall* when discussing recognized property rights under the Takings Clause of the United States Constitution, and described *Lawton* in a manner that would be entirely consistent with the holding in *Hall*. Consequently, even though we are not strictly bound to follow the holding in *Hall*, 51 F4th at 196, it appears to be well-founded on precedent of the United States Supreme Court, which *is* binding on us, *Tyler*, 598 US at 643; *Lawton*, 110 US at 149-150. Therefore, we hold that *Hall*, 51 F4th at 196, applies in this case and stands for the proposition that Oakland County committed a taking under the United States Constitution when it took title to plaintiffs' properties under the GPTA without paying plaintiffs just compensation for their equity in the subject properties. Because the trial court determined plaintiffs had not pleaded an unjust-takings claim under the United States Constitution, it erred. As succinctly stated by the Sixth Circuit when describing the exact situation presented in this case: "On the facts alleged here, [Oakland] County took the plaintiffs' property without just compensation, in violation of the Takings Clause." *Hall*, 51 F4th at 196. Thus, summary disposition under MCR 2.116(C)(8) was unwarranted and is reversed.

## IV. MICHIGAN TAKINGS CLAUSE

Plaintiffs contend the trial court improperly concluded our Supreme Court's decision in *Rafaeli* did not permit plaintiffs' takings claims against Oakland County under the Michigan Constitution. We agree.[7]

"[T]he Michigan Constitution requires that '[p]rivate property shall not be taken for public use without just compensation.' " *Blue Harvest*, 288 Mich App at 277, quoting Const 1963, art 10, § 2. "The government's seizure of real property is the clearest form of a taking requiring just compensation." *Rafaeli*, 505 Mich at 455. "But a taking can, and often does, encompass more than just the physical deprivation of real, tangible property; it also includes the government's interference with one's personal, intangible property." *Id*., citing *AFT Mich v Michigan*, 497 Mich 197, 218; 866 NW2d 782 (2015). While the general law regarding unjust takings under the

---

when deciding *Rafaeli*, 505 Mich at 458-459, but did not comment on the fact that no money was exchanged in the case and the governmental entity simply kept the property.

[7] The same standard of review stated above in Section III.A of this opinion also applies here.

-18-

Michigan Constitution is enlightening, the parties do not dispute that the outcome of this case depends on application of *Rafaeli*.

In *Rafaeli*, 505 Mich at 445-446, our Supreme Court considered the same statutory subsections at issue in the present case, which allowed Oakland County to take absolute title to a taxpayer's real property, regardless of the amount of the tax debt, after conducting the tax-foreclosure process. The case differed from the present case in one important way. Specifically, in *Rafaeli*, 505 Mich at 438-439, the plaintiffs' properties were not purchased for the minimum bid by another governmental entity under former MCL 211.78m(1), but were sold at a public tax-foreclosure sale by the FGU, Oakland County. These public auctions resulted in surplus proceeds retained by Oakland County—over $20,000 in one instance and over $75,000 in the other. *Rafaeli*, 505 Mich at 439. The GPTA did not provide any process by which the former property owners could petition for reimbursement of the excess proceeds of the tax-foreclosure sales. *Id*. at 449. While the parties in that case raised various challenges to Oakland County's actions, our Supreme Court decided the issue solely under the Takings Clause of the Michigan Constitution. *Id*. at 441, 478-479.

The Court noted the Michigan Takings Clause protected property interests that would have been recognized by the ratifiers of the 1963 Michigan Constitution. *Rafaeli*, 505 Mich at 456. To determine this, our Supreme Court conducted an exhaustive review of English common law, American common law, Michigan common law, and Michigan statutory law. *Id*. at 456-473. After doing so and citing many of the same cases discussed by the Sixth Circuit in *Hall*, the Court provided the following conclusion:

> It is clear that our 1963 Constitution protects a former owner's property right to collect the surplus proceeds following a tax-foreclosure sale under Article 10, § 2. This right existed at common law; was commonly understood to exist in the common law before the 1963 ratification of our Constitution; and continues to exist after 1963, as our decision in *Dean* [*v Michigan Dep't of Natural Resources*, 399 Mich 84; 247 NW2d 876 (1976),] demonstrates. Because this common-law property right is constitutionally protected by our state's Takings Clause, the Legislature's amendments of the GPTA could not abrogate it. While the Legislature is typically free to abrogate the common law, it is powerless to override a right protected by Michigan's Takings Clause. [*Rafaeli*, 505 Mich at 473.]

Of course, the issues in the present case arose from some of the specific statements made by the Court in *Rafaeli*, beginning with "our 1963 Constitution protects a former owner's property right to collect *the surplus proceeds following a tax-foreclosure sale* under Article 10, § 2." *Rafaeli*, 505 Mich at 473 (emphasis added). Defendants contend this means the holding in *Rafaeli* does not apply in the present case because there were no surplus proceeds from a foreclosure sale— Oakland County sold the property to Southfield for the "minimum bid" under former MCL 211.78m(1), which meant Oakland County only got what it was owed. Defendants recognize other statements from *Rafaeli*, 505 Mich at 476-477, including that the "plaintiffs' takings claim was not compensable until their properties sold for an amount in excess of their tax debts," and "a former property owner only has a right to collect the surplus proceeds from the tax-foreclosure sale; that is, a former property owner has a compensable takings claim if and only if the tax-foreclosure sale produces a surplus." The Court also addressed the plaintiffs' arguments in *Rafaeli*

-19-

that the measure of damages should be on the basis of the fair market value of the properties sold when the tax-foreclosure sale produces less than that amount. *Id*. at 482. Our Supreme Court responded to this argument in the following manner:

> We reject the premise that just compensation requires that [the] plaintiffs be awarded the fair market value of their properties so as to be put in as good of position had their properties not been taken at all. First, this would run contrary to the general principle that just compensation is measured by the value of the property taken. In this case, the property improperly taken was the surplus proceeds, not [the] plaintiffs' real properties. Second, [the] plaintiffs are largely responsible for the loss of their properties' value by failing to pay their taxes on time and in full. If [the] plaintiffs were entitled to collect more than the amount of the surplus proceeds, not only would they be taking money away from the public as a whole, but they would themselves benefit from their tax delinquency.

> Accordingly, when property is taken to satisfy an unpaid tax debt, just compensation requires the foreclosing governmental unit to return any proceeds from the tax-foreclosure sale in excess of the delinquent taxes, interest, penalties, and fees reasonably related to the foreclosure and sale of the property—no more, no less. [*Id*. at 483-484 (citations omitted).]

Defendants also cite this Court's decision in *Proctor*, 340 Mich App at 27, when it considered a similar argument: "[The p]laintiffs argue that, under the state Constitution, plaintiffs are entitled to recover more than merely the difference between the foreclosure-sale price and the delinquent taxes (plus interest, costs, and penalty fees, etc.)." More specifically, the "[p]laintiffs claim that they are also entitled to recover their loss of equity that resulted from the forfeiture and sale of the properties for less than market value." *Id*. Relying on our Supreme Court's decision in *Rafaeli*, 505 Mich at 483-484, the panel in *Proctor*, 340 Mich App at 27-28, determined the argument lacked merit.

Initially, it is apparent why the specific holdings of our Supreme Court in *Rafaeli*, and the interpretation of those holdings in *Proctor*, could be considered damaging to plaintiffs' unjust-takings claims under the Michigan Constitution in the present case. After all, *Rafaeli* and *Proctor* are generally binding on this Court and stated a former property owner can only obtain just compensation in the form of the surplus proceeds of a tax-foreclosure sale. As defendants consistently point out, there were no such surplus funds in this case. However, upon closer inspection, the decisions in *Rafaeli* and *Proctor* are distinguishable from the present case. As indicated above, the important difference between this case and those cases is that a public tax-foreclosure sale occurred in *Rafaeli* and *Proctor*, but not here.

Defendants attempt to gloss over this distinction by claiming the language in *Rafaeli* was clear—an unjust taking only occurs when there are surplus proceeds from a tax-foreclosure sale and the government retains those proceeds. They insist the Court in *Rafaeli*, 505 Mich at 477, could not have been more explicit when it said, "a former property owner has a compensable takings claim if and only if the tax-foreclosure sale produces a surplus." The Sixth Circuit in *Hall*, 51 F4th at 189, interpreted this highly specific language as "dictum" as it pertained to the same facts of the present case. It is logical that, in a case where a public foreclosure sale has occurred,

the value of the property at issue should be calculated by reference to the sale price. After all, as noted by our Supreme Court in *Rafaeli*, 505 Mich at 483, if instead the government was required to compensate property owners for value over the price of sale, the government would lose money in the process. As explained by the Sixth Circuit, when there is a public tax-foreclosure sale, "[t]he surplus is merely the embodiment in money of the value of [the property owners'] equitable title." *Hall*, 51 F4th at 195. In other words, the surplus funds realized after a tax-foreclosure sale flow directly from the equitable interest the property owners continued to maintain after forfeiture. *Id*. The right to a surplus "does not arise in manner akin to quantum mechanics, materializing suddenly without any apparent connection to anything that existed before. The owner's right to a surplus after a foreclosure sale instead follows directly from her possession of equitable title before the sale." *Id*.

In *Rafaeli*, our Supreme Court had no reason to consider what result would be required when the government merely retained title to the subject property and transferred it to another governmental entity for the cost of the tax debt and associated fees and costs. The right to the retention of surplus proceeds necessarily relies on an arms-length public auction, which allows for a real-time evaluation of the value of the subject property. When no such auction occurs, such as was the case here, the lack of surplus proceeds can hardly be described as not a taking—plaintiffs still lost their equitable title in their properties. The crux of *Rafaeli* was that the government cannot receive more than it was owed (including costs and fees, of course). In cases where there was a public tax-foreclosure sale, the amount the FGU received was the monetary value for which the property was sold. When there is no public sale, what did the FGU receive? A piece of real property with a certain value. Despite the lack of an exchange of currency, the government still received more than it was owed. Consequently, like the Sixth Circuit, we conclude the specific language in *Rafaeli* about former property owners having only an interest in the surplus from a public tax-foreclosure sale was obiter dicta. "Obiter dicta are not binding precedent. Instead, they are statements that are unnecessary to determine the case at hand and, thus, lack the force of an adjudication." *Secura Ins Co v Stamp*, 341 Mich App 574, 585 n 9; 991 NW2d 244 (2022). Because the facts in *Proctor*, 340 Mich App at 7-8, also reflected that tax-foreclosure sales occurred, this Court's discussion of *Rafaeli*'s holdings is likewise obiter dicta as related to this case, and thus, not binding on us presently. *Secura Ins Co*, 341 Mich App at 585 n 9.

Indeed, reading *Rafaeli* in this manner resolves issues that would otherwise arise if this Court interpreted *Rafaeli* in the manner requested by defendants. First, when the *Rafaeli* Court reached its decision, it did not have the benefit of the Sixth Circuit's decision in *Hall*, 51 F4th at 196, nor the United States Supreme Court's decision in *Tyler*, 598 US at 643. As discussed above, those two cases state and imply, respectively, that the Takings Clause of the United States Constitution protects plaintiffs' equitable interests in real property under the circumstances presented in this case. *Id*.; *Hall*, 51 F4th at 196. This is troubling as related to *Rafaeli*, because in that case, our Supreme Court plainly stated "that Michigan's Takings Clause has been interpreted to afford property owners greater protection than its federal counterpart when it comes to the state's ability to take private property for a public use under the power of eminent domain," *Rafaeli*, 505 Mich at 454, citing *Wayne Co v Hathcock*, 471 Mich 445; 684 NW2d 765 (2004), and again later, "our holding speaks to Michigan's Takings Clause, which this Court has, on occasion, interpreted as offering broader protection to property owners," *Rafaeli*, 505 Mich at 477, citing *AFT Mich*, 497 Mich at 217 n 9. It would be peculiar, then, for *Rafaeli* to be read in a manner allowing for greater protection under the Takings Clause of the United States Constitution than that under the

related state constitutional provision. Interpreting *Rafaeli* in the manner suggested above remedies this potential problem, and provides an indication such was the Michigan Supreme Court's intended meaning.

Second, by interpreting *Rafaeli* as recommended, the Court's citation to *Lawton*, 110 US at 149-150, when discussing the property interests recognized at common law would be more logical. *Rafaeli*, 505 Mich at 457-459. As discussed above and summarized by the Supreme Court in *Tyler*, 598 US at 643, the *Lawton* decision recognized an unjust-takings claim when there was no public tax-foreclosure sale, but instead, the FGU simply maintained title to the subject property. In such a case, the "surplus" was calculated by reference to the value of the property as opposed to the sale price, because no such sale price existed. *Tyler*, 598 US at 643. By relying on *Lawton*, our Supreme Court indicated such property rights were also recognized in Michigan, though the *Rafaeli* Court had no reason to later specify the difference when a case involves a public tax-foreclosure sale and another case does not. Therefore, the Court did not express itself in a manner that is clearly applicable to the present case, but implied such an understanding of the common law in place when the 1963 Michigan Constitution was ratified. Thus, we hold *Rafaeli* applies to the present case and does not preclude plaintiffs' unjust-takings claims under the Michigan Constitution. Instead, in situations when there is not a public tax-foreclosure sale, *Rafaeli* requires the "surplus" to be calculated on the basis of the value of the property retained, less what was legally owed.[8] Because the trial court erred in ruling otherwise and granting Oakland County's motion for summary disposition, we reverse.

## V. RETROACTIVITY OF MCL 211.78M AND 78T

Plaintiffs argue the trial court erred by refusing to give retroactive application to the amended language in MCL 211.78m and 78t. Because there is binding precedent on the issue, we agree.

This issue "concerns the statutory interpretation and retroactive application of amended statutes. We review both these matters de novo." *Buhl v City of Oak Park*, 507 Mich 236, 242; 968 NW2d 348 (2021). Once again, the trial court ignored binding precedent when deciding MCL 211.78m and 78t should not be retroactively applied to cases like the present one, when claims similar to those in *Rafaeli* were raised and pending on appeal when the Legislature amended the statute. *Proctor*, 340 Mich App at 25-26. As relayed above, Southfield was able to purchase the properties at issue in this case for the minimum bid because former MCL 211.78m(1) permitted it to do so. Indeed, the statute gave a city the right of first refusal, after the state, to purchase tax-foreclosed properties within the city's jurisdiction for the minimum bid, which was just the taxes and associated fees and costs, so long as such was for a public purpose. *Id*. After *Rafaeli*, the

---

[8] To further make the point, we question whether the Court's decision in *Rafaeli*, 505 Mich at 429, would be held to its strictest term if there was a tax-foreclosure sale but there was evidence the FGU took steps to ensure such was not "public," such as holding the sale at 1:00 a.m. on Sunday, or not giving any notice of the sale. If our Supreme Court believed the FGU engaged in such behavior to ensure it could obtain the subject property for the minimum bid, it would hardly seem logical that the property owner would be barred from bringing an unjust-takings claim under the holding in *Rafaeli*. The same logic applies here.

Legislature amended the GPTA, 2020 PA 256, adding MCL 211.78t, which provided an avenue for property owners to request surplus proceeds from tax-foreclosure sales of their real properties. The addition of MCL 211.78t contained references to the amended version of MCL 211.78m, 2020 PA 255, which no longer permitted cities to purchase tax-foreclosed properties for the minimum bid when claims had been made by the property owners for surplus funds. Instead, when such claims had been made, the amended version of MCL 211.78m(1) requires the city to pay "the greater of the minimum bid or the fair market value of the property."

The Legislature's addition of MCL 211.78t acknowledged there may be property owners seeking relief whose interests had been foreclosed, properties sold, and surplus funds kept *before* our Supreme Court decided *Rafaeli*. With respect to such individuals, under MCL 211.78t(1)(b), the Legislature stated their claims would only be permitted if they provided the proper notice of intention and "the Michigan supreme court orders that its decision in *Rafaeli*, [505 Mich 429], applies retroactively." In *Proctor*, 340 Mich App at 25-26, this Court considered whether the amended version of the GPTA should apply to the plaintiffs who had raised their challenges to the tax-foreclosure system in place before *Rafaeli* and the relevant amendments:

> The properties at issue in the present case were sold under § 78m "before July 18, 2020"; accordingly, MCL 211.78t(1)(b)(*i*) now provides the exclusive mechanism for the former property owners to claim the surplus proceeds from a tax sale. The statute indicates [the] plaintiffs' claims would not be viable unless our Supreme Court issues a ruling that *Rafaeli* is to be applied retroactively. However, 2020 PA 256 had an effective date of December 22, 2020, and the Legislature did not specify that the new statute had retroactive application. [The p]laintiffs' lawsuits and claims of appeal were all filed well before the effective date. Further, despite the wording of MCL 211.78t(1)(b)(*i*), this Court is empowered to rule that *Rafaeli* applies to [the] plaintiffs' claims because they were pending on appeal at the time of the *Rafaeli* decision and the enactment of 2020 PA 256. See *Hathcock*, 471 Mich at 484; see also *Davis v State Employees' Retirement Bd*, 272 Mich App 151, 155; 725 NW2d 56 (2006) ("[S]tatutes and amended statutes are to be applied prospectively unless the Legislature manifests an intent to the contrary."). MCL 211.78t(1)(b)(*i*) sets forth when a claim can be made, but plaintiffs had already made their claims before the *Rafaeli* decision and before the enactment of the statute. It would neither be logical nor just for the plaintiffs in *Rafaeli* to be entitled to relief, see *Rafaeli*, 505 Mich at 485, but the present plaintiffs denied relief, even though both sets of [the] plaintiffs raised and preserved the pertinent issue. This result is further buttressed by the detailed analysis and conclusion in *Rafaeli*, which our Supreme Court reached by consideration and application of the constitutional rights that existed at the time of the adoption of the 1963 Michigan Constitution. [*Proctor*, 340 Mich App at 25-26.]

While the above analysis is a bit confusing and seems to conflate the questions of retroactivity of *Rafaeli* with retroactivity of the amended version of the GPTA, the ultimate holding was clear— the plaintiffs were entitled to relief under the amended statutes because they preserved their claims before *Rafaeli* and the amendments. *Proctor*, 340 Mich App at 25-26. Under the doctrine of stare

decisis, of course, the *Proctor* Court's decision is binding on us. MCL 7.215(C)(2).[9] We therefore vacate the trial court's dismissal of any of plaintiffs' claims reliant on the retroactive application of the amended version of MCL 211.78m and 78t.

## VI. PLAINTIFFS' REMAINING CLAIMS

Plaintiffs contend the trial court improperly granted summary disposition in favor of defendants with respect to plaintiffs' inverse-condemnation, unjust-enrichment, and civil-conspiracy claims. We agree in part, and disagree in part.

## A. STANDARDS OF REVIEW

The trial court granted summary disposition under MCR 2.116(C)(7), (C)(8), and (C)(10). "We review de novo the circuit court's resolution of defendant['s] summary disposition motion." *Stephens v Worden Ins Agency, LLC*, 307 Mich App 220, 227; 859 NW2d 723 (2014). "[S]ummary disposition pursuant to MCR 2.116(C)(7)" is proper when "the moving party was entitled to judgment as a matter of law." *Wells Fargo Bank, NA v Null*, 304 Mich App 508, 518; 847 NW2d 657 (2014). "Summary disposition may be granted under MCR 2.116(C)(7) when a claim is barred by res judicata or collateral estoppel." *Allen Park Retirees Ass'n, Inc v City of Allen Park*, 329 Mich App 430, 443; 942 NW2d 618 (2019). "In reviewing a ruling pursuant to subrule (C)(7), we consider all documentary evidence submitted by the parties, accepting as true the contents of the complaint unless affidavits or other appropriate documents specifically contradict them." *Seldon v Suburban Mobility Auth for Regional Transp*, 297 Mich App 427, 432-433; 824 NW2d 318 (2012) (quotation marks, citation, and alterations omitted). Further, "the circuit court must accept the nonmoving party's well-pleaded allegations as true and construe the allegations in the nonmovant's favor." *Stephens*, 307 Mich App at 227 (quotation marks, citation, and alterations omitted). Likewise, "[t]he applicability of the doctrine of res judicata constitutes a question of law that this Court also reviews de novo." *Beyer v Verizon North Inc*, 270 Mich App 424, 428; 715 NW2d 328 (2006).

> We review de novo a circuit court's summary disposition decision. *Dalley* [], 287 Mich App [at] 304 []. "A court may grant summary disposition under MCR 2.116(C)(8) if the opposing party has failed to state a claim on which relief can be granted." *Id*. (quotation marks and brackets omitted). "A motion brought under subrule (C)(8) tests the legal sufficiency of the complaint solely on the basis of the pleadings." *Id*. (citation omitted). All well-pleaded factual allegations are accepted as true and construed in a light most favorable to the nonmoving party. *Id*. at 304-305. "Summary disposition on the basis of subrule (C)(8) should be granted only when the claim is so clearly unenforceable as a matter of law that no factual development could possibly justify a right of recovery." *Id*. at 305 (quotation marks and citation omitted). [*Nyman*, 329 Mich App at 543.]

---

[9] We note that, on remand, the trial court will potentially have the benefit of a decision of our Supreme Court with respect to the retroactivity of *Rafaeli*, which would settle the retroactivity of MCL 211.78t under the plain language of the statute.

"This Court [] reviews de novo decisions on motions for summary disposition brought under MCR 2.116(C)(10)." *Pace v Edel-Harrelson*, 499 Mich 1, 5; 878 NW2d 784 (2016). A motion for summary disposition under MCR 2.116(C)(10) "tests the factual sufficiency of the complaint . . . ." *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 206; 815 NW2d 412 (2012). "In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion." *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). Summary disposition is proper where there is no "genuine issue regarding any material fact." *Id.* "A genuine issue of material fact exists when reasonable minds could differ on an issue after viewing the record in the light most favorable to the nonmoving party." *Auto-Owners Ins Co v Campbell-Durocher Group Painting & Gen Contracting, LLC*, 322 Mich App 218, 224; 911 NW2d 493 (2017) (quotation marks and citation omitted).

## B. INVERSE CONDEMNATION

First, we consider plaintiffs' inverse-condemnation claim against Oakland County. "A property owner may bring an inverse condemnation action seeking just compensation for a 'de facto taking,' when the state fails to follow [the proper] procedures." *Dorman v Clinton Twp*, 269 Mich App 638, 645; 714 NW2d 350 (2006). There is "[n]o precise formula" for determining when a taking has occurred; however, "a 'taking' is not narrowly construed, nor does it require an actual physical invasion of the property." *Hinojosa v Dep't of Natural Resources*, 263 Mich App 537, 548; 688 NW2d 550 (2004). "Pertinent factors include whether 'the governmental entity abused its exercise of legitimate eminent domain power to plaintiff's detriment.' " *Id.*, quoting *Heinrich v Detroit*, 90 Mich App 692, 698; 282 NW2d 448 (1979). "When considering whether a de facto taking has occurred, we must consider the form, intensity, and the deliberateness of the government actions in the aggregate." *Dorman*, 269 Mich App at 645 (quotation marks omitted). In most cases alleging inverse condemnation, the plaintiff is required to establish two things: "(1) that the government's actions were a substantial cause of the decline of the property's value and (2) that the government abused its powers in affirmative actions directly aimed at the property." *Blue Harvest*, 288 Mich App at 277. There must also be a "causal connection" between the damages claimed by the plaintiff and the actions of the government. *Id.*

Initially, we question whether an inverse-condemnation claim is the appropriate claim for the wrongs identified by plaintiffs under the facts of this case. Specifically, plaintiffs do not allege a "de facto taking" by the governmental entities, but instead, they allege an *actual* taking. *Dorman*, 269 Mich App at 645. Indeed, the facts reveal that Oakland County and then Southfield took title to plaintiffs' properties, which included their equitable interests. There were not allegations the actions of the governmental entities resulted in a reduction of value of the properties, essentially amounting to a taking. Instead, the allegation is the governmental entities took title to plaintiffs' properties without providing just compensation. Thus, the proper analysis need not focus on whether inverse condemnation occurred, but whether Oakland County committed an unjust taking. For the reasons discussed above, plaintiffs have pleaded unjust-takings claims against Oakland County under the Michigan and United States Constitutions. Therefore, there seemingly is no reason to maintain an alternatively titled claim on the basis of the same constitutional provisions.

Nevertheless, our Supreme Court in *Rafaeli*, 505 Mich at 454, stated the plaintiffs in that case brought an "inverse-condemnation action alleging that [the] defendants have taken [the] plaintiffs' properties without just compensation." As discussed above, the Court concluded the plaintiffs' claims were legitimate under the Michigan Constitution. *Id*. at 484. The "defendants' retention and subsequent transfer of those proceeds into the county general fund amounted to a taking of [the] plaintiffs' properties under Article 10, § 2 of our 1963 Constitution." *Rafaeli*, 505 Mich at 484-485. The Court's decision in *Rafaeli* states that a claim of inverse condemnation is colorable under facts similar to those presented in this case. Thus, it appears that, under *Rafaeli*, 505 Mich at 484-485, the trial court erred when it summarily disposed of plaintiffs' inverse-condemnation claims, and we now reverse that decision.[10]

## C. RES JUDICATA

Plaintiffs argue the trial court improperly determined Hayes's and SMFJ's claims were barred by res judicata. The city and corporate defendants argue Hayes's and SMFJ's claims were barred by the doctrine of res judicata because they could have been brought in their previous action. Notably, despite Oakland County not presenting any argument on this issue, absent error by the trial court, Hayes's and SMFJ's claims against Oakland County for unjust takings and inverse condemnation would not be permitted to continue. The trial court's order granting summary disposition in favor of defendants spoke broadly about applying the doctrine of res judicata against Hayes and SMFJ: "The claims of Plaintiffs Hayes and SMFJ are barred by *res judicata* because they arise from the came core set of facts related to the foreclosure and transfer of their former properties and could have been raised in the previous lawsuit."

"The doctrine of res judicata is employed to prevent multiple suits litigating the same cause of action." *Adair v Michigan*, 317 Mich App 355, 365; 894 NW2d 665 (2016) (quotation marks and citation omitted). "The doctrine bars a second, subsequent action when (1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been, resolved in the first." *Washington v Sinai Hosp of Greater Detroit*, 478 Mich 412, 418; 733 NW2d 755 (2007) (quotation marks and citation omitted). "The doctrine bars not only claims already litigated, but also every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not." *Adair*, 317 Mich App at 365 (quotation marks and citation omitted). Michigan courts "use[] a transactional test to determine if the matter could have been resolved in the first case." *Washington*, 478 Mich at 420. "The 'transactional' test provides that the assertion of different kinds or theories of relief still constitutes a single cause of action if a single group of operative facts give rise to the assertion of relief." *Id*. (quotation marks and citation omitted). "Whether a factual grouping constitutes a transaction for purposes of res judicata is to be determined pragmatically, by considering whether the facts are related in time, space, origin or motivation, [and] whether they form a convenient trial unit . . . ." *Adair*, 317 Mich App at 366-367 (quotation marks and citation omitted; alterations in original).

---

[10] Regardless of the nomenclature used, though, plaintiffs are only entitled to one form of relief, whether it be unjust takings or inverse condemnation.

After the judgment of foreclosure was entered, Hayes and SMFJ joined others in a lawsuit against the Oakland County Treasurer and Meisner ("the treasury defendants"), Southfield, and SNRI. In that case, Hayes and SMFJ contended that title to their property had been taken by the treasury defendants, improperly deeded to Southfield under its right of first refusal under former MCL 211.78m(1), and then conveyed to SNRI. Hayes and SMFJ alleged, in part, that they had been the victim of a scheme to take their equity in their properties. The purpose of the scheme, Hayes and SMFJ alleged, was to remove African-American homeowners from Southfield. Thus, the lawsuit implied Southfield's exercise of it right of first refusal was not for a proper "public purpose" as required by the statute. Hayes and SMFJ also claimed they were denied adequate notice before title to their property was taken. As damages for the harm suffered, Hayes and SMFJ requested "equitable relief if possible, or actual damages sustained including the loss of equity" in the properties, considering the tax debt was significantly less than the fair market value of those properties. The treasury defendants, Southfield, and SNRI moved the trial court in that case for summary disposition under MCR 2.116(C)(8). The trial court granted the motion, reasoning that Hayes's and SMFJ's claims had no merit. Hayes and SMFJ did not appeal that decision.

Plaintiffs do not dispute the first two elements of res judicata are fulfilled, but focus on the third element instead. The final element for res judicata to apply is that "the matter in the second case was, or could have been, resolved in the first." *Washington*, 478 Mich at 418 (citation omitted). Some of the arguments in the present case undoubtedly were not argued in Hayes and SMFJ's first case. Indeed, plaintiffs insist there were no unjust-takings claims under the United States and Michigan Constitutions in the previous litigation. The question then becomes, could those claims have been brought in Hayes's and SMFJ's prior action? *Id*. The most important fact related to this issue is that, in the original case, Hayes and SMFJ were again part of a putative class action. Thus, their ability to make claims in that case were limited by the types of claims common to their class. In that case, the class was defined as African-American homeowners who had lost title to their homes, and the equity accrued therein, under the same system challenged in this case. The complaint alleged that the scheme resulted in housing discrimination on the basis of race, with the ultimate goal being to remove African-American homeowners from the city. In this case, the class was not limited by racial divides, and thus, the claims did not have to pertain to fair-housing practices. Given the premature state of the record, it is not entirely clear whether Hayes and SMFJ's class in the first case could have brought the same claims as their class in this case. Thus, because Hayes and SMFJ may have been limited in bringing all of the claims here in the putative class action of which they previously were members, it is likely that the additional claims in this case *could not* have been resolved in the previous case, and res judicata should not apply. *Id*. Consequently, the trial court erred when it granted summary disposition of Hayes's and SMFJ's claims on the basis of res judicata, especially because the order was entered before any discovery has taken place. *Id*. We vacate that portion of the trial court's order without prejudice.

## D. UNJUST ENRICHMENT AND CIVIL CONSPIRACY

Plaintiffs challenge the trial court's ruling related to their unjust-enrichment claims, which were brought solely against SNRI, and their civil-conspiracy claims brought against the city and corporate defendants. Both of these claims fail for the same reason, and therefore will be addressed together. Our Supreme Court "has long recognized the equitable right of restitution when a person has been unjustly enriched at the expense of another." *Michigan Ed Employees Mut Ins Co*, 460 Mich at 197. "Whether a specific party has been unjustly enriched is generally a question of fact

. . . [but] whether a claim for unjust enrichment can be maintained is a question of law[.]" *Morris Pumps v Centerline Piping, Inc*, 273 Mich App 187, 193; 729 NW2d 898 (2006). "A claim of unjust enrichment requires the complaining party to establish (1) the receipt of a benefit by the other party from the complaining party and (2) an inequity resulting to the complaining party because of the retention of the benefit by the other party." *Karaus v Bank of NY Mellon*, 300 Mich App 9, 22-23; 831 NW2d 897 (2012).

This Court has held that "not all enrichment is necessarily unjust." *Landstar Express America, Inc v Nexteer Auto Corp*, 319 Mich App 192, 205; 900 NW2d 650 (2017). In the context of a third party potentially benefiting from previous dealings, this Court expounded upon that rule in *Karaus*:

> A third party is not unjustly enriched when it receives a benefit from a contract between two other parties, where the party benefited has not requested the benefit or misled the other parties. . . . Otherwise stated, the mere fact that a third person benefits from a contract between two other persons does not make such third person liable in quasi-contract, unjust enrichment, or restitution. Moreover, where a third person benefits from a contract entered into between two other persons, in the absence of some misleading act by the third person, the mere failure of performance by one of the contracting parties does not give rise to a right of restitution against the third person. [*Karaus*, 300 Mich App at 24, quoting *Morris Pumps*, 273 Mich App at 196, quoting 66 Am Jur 2d, Restitution and Implied Contracts, § 32, p 628.]

"A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Advocacy Org for Patients & Providers v Auto Club Ins Ass'n*, 257 Mich App 365, 384; 670 NW2d 569 (2003) (quotation marks and citation omitted). "However, a claim for civil conspiracy may not exist in the air; rather, it is necessary to prove a separate, actionable tort." *Id*. (quotation marks and citation omitted). The corporate defendants rely on this caselaw by arguing plaintiffs' civil-conspiracy claims fail because they did not plead a separate, actionable tort. *Id*. However, plaintiffs clarified they brought a civil-conspiracy claim under 42 USC 1983, which has different requirements and does not require a separate, actionable tort:

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant. [*Spadafore v Gardner*, 330 F3d 849, 854 (CA 6, 2003) (quotation marks and citation omitted).][11]

---

[11] We acknowledge we are "not bound by decisions of any lower federal courts, because '[a]lthough lower federal court decisions may be persuasive, they are not binding on state

A claim under 42 USC 1983, which includes a civil-conspiracy claim, is premised on a violation of a constitutional right, not a common-law tort. *Radu v Herndon & Herndon Investigations, Inc*, 302 Mich App 363, 389-390; 838 NW2d 720 (2013). Consequently, plaintiffs' failure to plead a separate, actionable tort was not a valid reason for summarily disposing of their civil-conspiracy claims under 42 USC 1983.

As indicated above, there is a single reason why plaintiffs' unjust-enrichment and civil-conspiracy claims must fail—causation. The second element of a claim for unjust enrichment requires plaintiffs to plead and prove "an inequity resulting to [plaintiffs] *because of* the retention of the benefit by" SNRI. *Karaus*, 300 Mich App at 22-23 (emphasis added). With respect to the civil-conspiracy claim, plaintiffs were required to plead and prove "an overt act was committed in furtherance of the conspiracy that *caused injury* to" plaintiffs. *Spadafore*, 330 F3d at 854 (emphasis added). Briefly then, both of these claims have a causation element. *Karaus*, 300 Mich App at 22-23; *Spadafore*, 330 F3d at 854. Notably, plaintiffs have not pleaded those claims against Oakland County. Instead, the unjust-enrichment claim is against SNRI only, and the civil-conspiracy claim is against the city and corporate defendants. Given this, plaintiffs cannot prove causation.

From the analysis above, it is plain the unjust taking faced by plaintiffs occurred when Oakland County took absolute title to their properties without any manner under the GPTA of allowing plaintiffs to request and receive just compensation for their equitable interests in those properties. See *Rafaeli*, 505 Mich at 484-485; *Hall*, 51 F 4th at 196. As explained by the Sixth Circuit, the constitutional violation was Oakland "County's taking of 'absolute title' to the plaintiffs' homes. Before that event, the plaintiffs held equitable title; after it, they held no title at all. Thus, so far as the Takings Clause is concerned, [Oakland] County alone is responsible for the taking of the plaintiffs' property." *Id*. Importantly, under the GPTA as it then existed, at the moment Oakland County took title to plaintiffs' properties in this case, regardless of what happened afterward, there was no way plaintiffs would ever be paid for their equitable interests in their properties. To put it another way, plaintiffs would have been in the exact same position if Oakland County sold the properties at a public auction, kept the properties for itself, or sold the properties to Michigan for the minimum bid. Regardless of what occurred, no money was ever going to be paid to plaintiffs. Thus, all of the damages were done when Oakland County acted and could not have changed regardless of the subsequent actions of the city and corporate defendants.

Therefore, with respect to the city and corporate defendants, as related to plaintiffs' claims against them, they simply did not cause plaintiffs to suffer damages. Because causation is an element of both claims, the trial court properly granted summary disposition in favor of the city and corporate defendants as related to those claims. See *Karaus*, 300 Mich App at 22-23; *Spadafore*, 330 F3d at 854. Simply put, because plaintiffs did not plead facts that could ever sustain causation in their civil-conspiracy and unjust-enrichment claims, they "failed to state []

---

courts[.]' " *Bienenstock & Assoc*, 314 Mich App at 515, quoting *Abela*, 469 Mich at 606-607. However, we find this decision from the Sixth Circuit to be persuasive.

claim[s] on which relief can be granted," warranting summary disposition under MCR 2.116(C)(8). *Nyman*, 329 Mich App at 543 (quotation marks and citation omitted).[12]

## VII. CONCLUSION[13]

For all of the reasons stated above, we reverse in part, vacate in part, affirm in part, and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly

---

[12] We express no opinion on whether Oakland County has a claim against any of the other defendants in this case, considering the facts presented here. We merely note that if the properties had gone to an auction, Oakland County would only be responsible for the surplus funds it realized under *Rafaeli*. Further, those would be benefits Oakland County *actually received*, which presumably would dampen the blow of having to repay it. On the facts presented here, it seems the city and corporate defendants only *caused* one entity to suffer actual damages—Oakland County.

[13] In light of our decisions above, the remaining issues raised by the parties have been rendered moot, and we decline to consider them. See *TM v MZ*, 501 Mich 312, 316-317; 916 NW2d 473 (2018).