# UNITED STATES v. LAWTON.

## APPEAL FROM THE COURT OF CLAIMS.

Submitted January 4th, 1884.—Decided January 21st, 1884.

### Statutes—Tax-Sale.

Land subject to a direct tax was sold for its non-payment, and was bought in for the United States for the sum of $1,100, under section 7 of the act of June 7th, 1862, c. 98, as amended by the act of February 6th, 1863, c. 21, 12 Stat. 640, the tax, penalty, interest and costs being $170.50. No money was paid. The United States took possession of the land, and leased it, and afterwards sold all but 50 acres for $130, under the act of June 8th, 1872, c. 337, 17 Stat. 330. The land was not redeemed. Application by its owner was made to the Secretary of the Treasury for the $929.50 surplus,

and, no action being taken thereon, he sued in the Court of Claims to recover that sum : *Held*, That he was entitled to recover it.

Whether § 12 of the act of June 7th, 1862, c. 98, 12 Stat. 422, in regard to the disposition of one-half of the proceeds of the subsequent leases and sales of land struck off to the United States at a sale for the non-payment of the tax, applies to the land in this case—*quære*.

No question as to the disposition of such proceeds can affect the right of the claimant in this case to the $929.50.

The rulings in *United States* v. *Taylor*, 104 U. S. 216, applied to this case.

The appellee recovered a judgment in the Court of Claims against the United States for $929.50. *Lawton's Case*, 18 C. Cl. R. 595. That court found the following facts : In 1827, James Stoney, of South Carolina, died leaving a will, which was duly proved, and contained the following provision :

"The other equal part or share of my personal property, charged and chargeable with the payment of half of the said annuity to my beloved wife, Elizabeth, together with all the lands I possess on the south side of Broad Creek on the Island of Hilton Head, I give and devise unto such person or persons as I shall hereafter appoint my executor or executors, to and to the use of them or him, my executor or executors, their heirs, executors, and assigns, upon the trust nevertheless, and to and for the intent and purpose hereinafter expressed and declared of and concerning the same ; that is to say, upon trust for the sole benefit of my beloved daughter, Martha S. Barksdale, for and during her natural life, free from the debts, contracts, and engagements of any husband to whom she may be allied, or the claims of his creditors ; and upon the death of my said daughter, Martha S. Barksdale, it is my will, intention, and desire that the trusteeship above created in my executor or executors over the said part of my real estate and personal property shall immediately dissolve and expire ; and, if my said daughter, Martha S. Barksdale, shall have any lawful issue living at the time of her death, then I give and devise the said part of my real and personal property to such issue, him, her, or them and their heirs forever."

A tract of land known as the Hill Place, in St. Luke's Parish, South Carolina, was a part of the estate so devised. Martha S. Barksdale, named in the will, entered into possession

of the Hill Place, under the devise, and continued in possession until dispossessed, in consequence of the tax sale hereinafter mentioned. After the making of the will she became the lawful wife of Joseph A. Lawton. The appellee was her lawful and only living issue. In November, 1862, the direct tax commissioners of the United States assessed a direct tax on the Hill Place, amounting to $88, and in December, 1873 (a mistake, probably, for 1863), it was sold for non-payment of the tax. The amount of the tax, penalty, interest and costs, was $170.50. The property was " struck off for the United States by the tax commissioner," for the sum of $1,100, and a tax certificate, which was on file in the office of the Commissioner of Internal Revenue, was issued therefor, but no money was paid, " the tax commissioners having bid in the property for the United States." The board of tax commissioners took possession of the land in the name of the United States, and from time to time leased the same. The amount realized from the leasing does not appear. The United States are still in possession of 50 acres. The remainder was sold at public sale in December, 1875, for $130, under the provisions of the act of June 8th, 1872, c. 337, 17 Stat. 330. No application under that act and the acts supplementary thereto, for redemption of the property, was ever made. It did not appear that the appellee ever parted with his interest in the remainder of the tract, except as dispossessed by the tax sale, or that he ever assigned his right to receive the surplus remaining from the purchase money. Mrs. Lawton died in April, 1880. It did not appear that during her lifetime any demand was made upon the treasury for the surplus. In May, 1882, the appellee applied to the Secretary of the Treasury for any surplus proceeds of the sale which might be in the treasury. No action was taken thereon, and nothing has been paid to the appellee on such application.

*Mr. Solicitor-General* and *Mr. John S. Blair* for appellant.

*Mr. William E. Earle* for appellee.

Mr. Justice Blatchford delivered the opinion of the court. After reciting the above stated facts he continued :

We think that this case is governed by the rulings of this court in *United States .v. Taylor*, 104 U. S. 216. In that case the land sold for the non-payment of the tax was sold to a person who paid the purchase money to the United States, and the surplus proceeds were in the treasury. It was held that the provision of section 36 of the act of August 5th, 1861, ch. 46, 12 Stat. 292, in regard to the surplus of the proceeds of sale, was not repealed by anything in section 12 or any other section of the act of June 7th, 1862, ch. 98, 12 Stat. 422. It was also held that the Court of Claims had jurisdiction of a suit for such proceeds when the application to the Secretary of the Treasury and the bringing of the suit therefor both of them occurred more than six years after the sale for the non-payment of the tax.

The present case differs from the Taylor case only in this, that the land was in this case bought in by the tax commissioners for the United States, and no money was paid on the sale. It was so bought in for a sum which exceeded by $929.50 the tax, penalty, interest and costs. This was done under the authority of section 7 of the act of June 7th, 1862, as amended by the act of February 6th, 1863, ch. 21, 12 Stat. 640, which authorized the commissioners to bid off for the United States land sold for the tax at a sum not exceeding two-thirds of its assessed value, unless some person should bid a higher sum, and also provided that at a sale any land which might be selected, under the direction of the President, for government use, might be bid in by the commissioners, under the direction of the President, for, and struck off to, the United States. The land in the present case having been " struck off for," and " bid in ". for, the United States at the sum of $1,100, we are of opinion that the surplus of that sum, beyond the $170.50 tax, penalty, interest and costs, must be regarded as being in the treasury of the United States, under the provisions of section 36 of the act of 1861, for the use of the owner, in like manner as if it were the surplus of purchase money received by the United States from a third person on a sale of the land to such person

for the non-payment of the tax. It was unnecessary to go through any form of paying money out of the treasury to any officer and then paying it in again to be held for the owner of the land. But, so far as such owner is concerned, the surplus money is set aside as his as fully as if it had come from a third person. If a third person had bid $1,099 in this case, there would have been a surplus of $928.50 paid into the treasury, and held for the owner. It can make no difference that the United States acquired the property by bidding $1 more. To withhold the surplus from the owner would be to violate the Fifth Amendment to the Constitution and to deprive him of his property without due process of law, or to take his property for public use without just compensation. If he affirms the propriety of selling or taking more than enough of his land to pay the tax and penalty and interest and costs, and applies for the surplus money, he must receive at least that.

The appellants rely very much on the provisions of section 12 of the act of 1862, which require that one-half of the proceeds of subsequent leases and sales of land struck off to the United States at a sale for the non-payment of the tax, shall be, under certain circumstances, paid to the State in which the land lies; and contend that those provisions apply to the land in this case bought in under the act of 1863. The view urged is, that if the United States pays to the appellee the $929.50, and to the State one-half of the proceeds of subsequent leases and sales of the land, they will pay out more than the surplus of the proceeds of the original sale. It is not necessary to determine whether section 12 of the act of 1862 applies to the land in this case, even if it would be proper to do so in a case where the State is not represented as a claimant to the proceeds of leases and sales. No question as to the disposition of such proceeds can properly affect the right of the appellee to this surplus money. His claim is to the surplus money arising on the original sale, and not to any proceeds of any dealing with the land by the United States afterwards.

The application made to the Secretary of the Treasury for the surplus not having been complied with, the appellee was entitled to bring this suit, as on an implied contract to pay over

the surplus. It not having been paid to the trustees under the will, or to the life-tenant, the appellee, as remainderman, is clearly entitled to it.

*The judgment of the Court of Claims is affirmed.*