RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0070p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

FAYTIMA HOWARD,

　　　　　　　　　*Plaintiff-Appellant*,

　　*v.*

MACOMB COUNTY, MICHIGAN,

　　　　　　　　　*Defendant-Appellee*.

No. 24-1665

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Bay City.
No. 1:23-cv-12595—Thomas L. Ludington, District Judge.

Argued:  March 20, 2025

Decided and Filed:  March 28, 2025

Before:  SUTTON, Chief Judge; MOORE and RITZ, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Philip L. Ellison, OUTSIDE LEGAL COUNSEL PLC, Hemlock, Michigan, for Appellant.  Frank Krycia, MACOMB COUNTY, Mount Clemens, Michigan, for Appellee.  Theodore Seitz, DYKEMA GOSSETT PLLC, Lansing, Michigan, for Amicus Curiae.  **ON BRIEF:**  Philip L. Ellison, OUTSIDE LEGAL COUNSEL PLC, Hemlock, Michigan, for Appellant.  Frank Krycia, MACOMB COUNTY, Mount Clemens, Michigan, for Appellee.  Theodore W. Seitz, Mark J. Magyar, DYKEMA GOSSETT PLLC, Lansing, Michigan, Matthew B. Hodges, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, Donald R. Visser, VISSER AND ASSOCIATES, PLLC, Kentwood, Michigan, for Amici Curiae.

———————————

**OPINION**

———————————

SUTTON, Chief Judge.　After Faytima Howard failed to pay her property taxes, Macomb County seized and sold her property in 2023.　She sued, alleging that the county violated the Takings Clause of the Fifth Amendment by keeping proceeds allegedly in excess of her tax debt. There was a time when the Michigan foreclosure regime violated the State and Federal Constitutions.　In 2020, the Michigan Supreme Court ruled that Michigan's failure to compensate property owners for the gap between their tax debts and the price realized from foreclosure sales of their property violated the Takings Clause of the Michigan Constitution.　*See Rafaeli, LLC v. Oakland County*, 952 N.W.2d 434, 466 (Mich. 2020).　Two years later, we held that the same law violated the Takings Clause of the U.S. Constitution.　*See Hall v. Meisner*, 51 F.4th 185, 196 (6th Cir. 2022).

Howard faces two problems in relying on those precedents today.　One is that the State, in response to the Michigan Supreme Court's decision, amended its law in 2020 to permit property owners to obtain any surplus value in their foreclosed properties.　The new law corrected the constitutional deficiencies of the old one.　The other is that Howard did not take advantage of that process.　For these reasons, the district court dismissed the complaint for failure to state a claim.　We affirm.

I.

Faytima Howard owned property in Macomb County, Michigan.　By March 2020, she had fallen at least a year behind on her property taxes.　That prompted Macomb County to begin the process of foreclosing her property under Michigan's General Property Tax Act.　*See* Mich. Comp. Laws § 211.1 *et seq.*

The process lasted around three years and gave Howard several chances to pay her taxes and avoid foreclosure.　During 2020, the county mailed Howard three notices informing her of her unpaid taxes and giving her an opportunity to pay them.　*See id.* §§ 211.78b, 211.78c, 211.78f.　By March 2021, when she still had not paid the taxes, the county deemed her property

forfeited. *See id.* § 211.78g(1)–(2). That allowed the county to begin foreclosure proceedings, even as Howard retained title to the property and the right to use it.

The county filed a petition to foreclose Howard's property in June 2021. *See id.* § 211.78h(1). The county sent a new notice to Howard, this time (1) notifying her about an upcoming hearing where she could object to the taxes or work out a plan to pay them, *see id.* §§ 211.78j(1), 211.78k(2), and (2) notifying her of the right to claim any proceeds exceeding her tax debt if the county sold the property. *See id.* § 211.78i(2)–(3), (7)(i). The record does not reveal whether she attended the hearing. What it does reveal is that the county moved forward with the foreclosure proceedings. In February 2022, the state court entered a judgment of foreclosure that gave the county title to her property. *See id.* § 211.78k(5)–(6).

The county held a foreclosure sale. It sold the property for $499,007, a price that Howard alleges is "much greater" than her unspecified tax debt. R.3 at 4. Because Howard never invoked the Act's process for claiming any surplus proceeds, the county kept the full amount.

In October 2023, Howard sued Macomb County on behalf of herself and other property owners, alleging that it violated the Takings Clause of the Fifth Amendment by retaining the proceeds of the sale beyond the amount of her tax debt. The district court dismissed the complaint for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6).

## II.

The Takings Clause of the Fifth Amendment ensures that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V. The guarantee applies to the States through the Fourteenth Amendment. *First Eng. Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 310 n.4 (1987). While the Clause prohibits States from taking property without paying for it, the Clause does not prohibit them from taxing it. *County of Mobile v. Kimball*, 102 U.S. 691, 703 (1880). Neither does the Clause prohibit States from employing measures to collect these taxes, such as imposing interest and fees for unpaid taxes or foreclosing on the property to satisfy the debt. *Jones v. Flowers*, 547 U.S. 220, 234 (2006).

The power to tax ends, and the duty to account for a taking begins, when a State confiscates more property than it is owed. *See Tyler v. Hennepin County*, 598 U.S. 631, 639 (2023). In the context of a foreclosure sale, that means the State may keep the proceeds of a foreclosure sale to the extent they cover the tax debt, including any interest and fees as well as costs of collection. *See id.* at 638–42. But any residual after that belongs to the property owner, not the State. *See id.*; *United States v. Lawton*, 110 U.S. 146, 149–50 (1884).

All of this, the Supreme Court concluded in *Tyler*, flows from the language of the Takings Clause and background principles of English common law. *See Tyler*, 598 U.S. at 639–40. "The principle that government may not take more from a taxpayer than she owes can trace its origins at least as far back as Runnymeade in 1215, where King John swore in the Magna Carta" that the sheriff may satisfy the debts of a dead man by seizing his property, but only "until the debt which is evident shall be fully paid." *Id.* at 639 (quoting W. McKechnie, *Magna Carta, A Commentary on the Great Charter of King John*, ch. 26, p. 322 (rev. 2d ed. 1914)). English statutory law adopted the same limit. At the same time that "Parliament gave the Crown the power to seize and sell a taxpayer's property to recover a tax debt," it demanded "that any '[o]verplus' from the sale 'be immediately restored to the [o]wner.'" *Id.* (quoting 4 W. & M., ch. 1, § 12, in 3 Eng. Stat. at Large 488–89 (1692)). English common law, too, required the seller to "render back the overplus." 2 William Blackstone, *Commentaries on the Laws of England *284 (1766). The residual reflected the value of the owner's "equitable estate" in the property that exceeded the debt. *See Casborne v. Scarfe*, 1 Atk. 603, 606; 26 Eng. Rep. 377, 379 (1737); 6 Holdsworth, *A History of English Law* 663 (1924); *Hall*, 51 F.4th at 194–95. When these rights traveled "across the Atlantic," the newly minted States and the National Government protected them as well. *Tyler*, 598 U.S. at 640.

Until a few years ago, Michigan did not follow these principles. But recently, its own Supreme Court, *Rafaeli*, 952 N.W.2d at 454–60, together with the federal courts, *see Tyler*, 598 U.S. at 638–45; *Hall*, 51 F.4th at 189–96, established that the State had no right to keep the residual from its foreclosure sales—the amount of the sale that exceeded the property owner's debt.

In an effort to correct this problem, the State established a procedure by which a property owner may recover the surplus after a foreclosure sale. *See* Mich. Comp. Laws § 211.78t. The State now gives owners a chance to recover any surplus, lest a permissible exercise of the taxing power stretch into an impermissible taking. *See Tyler*, 598 U.S. at 647.

*Nelson v. City of New York* shows that this kind of process complies with the Takings Clause. 352 U.S. 103 (1956). New York City gave property owners, delinquent on their property taxes, up to seven weeks to pay the overdue taxes after the city filed for foreclosure as well as an additional twenty days to file an answer in the foreclosure proceeding. *Id.* at 105–06, 110. If the owners wanted any surplus from the upcoming sale, they had to make it known through a timely filed answer. *Id.* at 104 n.1, 110. With these procedures in place, the city foreclosed on several properties. *Id.* at 104–06. The owners did not follow the requisite steps for requesting the surplus from the foreclosure sale. *Id.* at 106. The city kept the surplus, prompting the owners to sue to get it back. *Id.* at 106, 110. No taking occurred, the Court reasoned, because the owners gave up their rights to the surplus by failing to follow the process for obtaining it. *Id.* at 110.

The Supreme Court stood by *Nelson* in *Tyler*, explaining that the Takings Clause permits each State to "define[] the process through which [an] owner [can] claim the surplus" and to keep the surplus if the owners do not comply. *Tyler*, 598 U.S. at 644. *Tyler* held that Hennepin County, Minnesota, committed a taking when it kept an owner's surplus after a foreclosure sale and failed to offer the owner any way to get it back. *Id.* at 647. The Court distinguished Minnesota's law, which gave the owner no opportunity to obtain the surplus, from the New York City law at issue in *Nelson*, which set the process for claiming it and made the owners responsible for their decision not to follow it. *Id.* at 644.

*Nelson*'s insight, that States may require owners to follow a statutory process for obtaining a surplus, respects historical practices in the area. At common law, property owners resorted to "ordinary legal remedies" to recoup their surplus when the State did not provide a manner for refunding it. *Farnham v. Jones*, 19 N.W. 83, 85 (Minn. 1884). English and American courts considered it "well settled" that property owners could bring actions for trover or trespass against the officer charged with selling the property. *See Cone v. Forest*, 126 Mass.

97, 100–01 (1879); *Farnham*, 19 N.W. at 85; *Stead v. Gascoigne*, 129 Eng. Rep. 488, 488; 8 Taunt. 527, 528 (1818); *Batchelor v. Vyse*, 174 Eng. Rep. 113, 114; 1 M. & Rob. 331, 333 (1834).

At the same time, some States enacted laws to "regulate the manner of enforcing the [property owners'] right" to the surplus. *Farnham*, 19 N.W. at 85. A few States required property owners to request the surplus and show their entitlement to it. *See, e.g.*, S.C. Rev. Stat. ch. 15, § 357 (1894); Or. Codes & Gen. Laws ch. 17, § 2824 (1887); Me. Rev. Stat. tit. I, ch. 6, § 35 (1857); N.Y. Rev. Stat. part I, ch. VIII, tit. VIII, § 10 (1846). One State required property owners to "file with the [state court] clerk a waiver of all objections" to the sale in order to receive the surplus. Wa. Code § 367(5) (1881). At least three other States, one in its constitution, required property owners to claim their surplus within a certain time, lest they forfeit their right to it. *See* S.C. Rev. Stat. tit. III, ch. XV, art. IV, § 357 (1894) (requiring the State to hold the surplus for "five years from [the] date of sale" to be refunded to "any person or persons conclusively proving . . . that they are entitled to said surplus . . . on account of their former ownership"); W. Va. Const. art. IX, § 6 (1870) (requiring owners to "file[]" a "claim" to the surplus in "the Circuit Court which decreed the sale[] within two years thereafter"); Minn. Gen. Stat. ch. 81, tit. II, § 35 (1867) (requiring owners to "appl[y] for" their surplus within "three months" after the sale). Some States, it is true, enacted positive laws entitling property owners to the surplus. *See, e.g.*, Ind. Rev. Stat. ch. 12, art. X, § 162 (1843) ("If the real or personal property of any person shall be sold for taxes, . . . the residue shall be paid to the person entitled by law to the same . . . ."); Va. Rev. Code app. IV, ch. 5, § 5 (1819) (requiring the State "to pay the surplus, if any, to the person who may have been proprietor of the land"); An act in New Hampshire relating to constables collecting rates or assessments, § 5 (enacted 1719, repealed 1792) (requiring the sheriff "to return the overplus upon such sale, if any be, unto the owner"). But not one State to our knowledge required the government to return the surplus immediately to the owner without any requirement that the owner cooperate with the State.

Still other States experimented with different ways to account for the surplus. At least one other State, instead of paying owners their surplus out of the treasury, required the purchasers of the property to give the owners bonds for the amount of the surplus. *See, e.g.*,

Pa. Gen. Laws ch. 137, § 2 (1847). The owner could seek payment on the bond for "at least twenty years." *Thudium v. Deardorf*, 3 Pa. 90, 92–93 (1846). Some States also tried to avoid surpluses altogether by permitting the sale of only so much land as necessary to pay the tax and holding the sale void otherwise. *See, e.g.*, *Margraff v. Cunningham's Heirs*, 57 Md. 585, 588 (1882); *Loomis v. Pingree*, 43 Me. 299, 311 (1857); Digest of the State Laws of Ala., Taxes § 50 (1843). Through it all, we are not aware of any State that gave citizens a right into perpetuity to reclaim surplus funds from a government foreclosure sale and to do so without having to follow any state procedures along the way.

Michigan now does what *Nelson* and *Tyler* and background historical practices allow. Michigan law gave Howard an opportunity to recover her surplus and set several reasonable steps for claiming it. Before foreclosing on a property, the Act requires the county to mail owners notice of their right to "any remaining proceeds" from a sale. Mich. Comp. Laws § 211.78i(7)(i). The Act gives owners nearly four months to mail a form stating their "intention to claim" any "remaining proceeds" to the county. *Id.* § 211.78t(1)(a), (2). The county posts the one-page form online along with steps for submitting it. *Auction and claims*, www.macombgov.org/departments/treasurers-office/tax-foreclosure/auction-and-claims (last visited Mar. 27, 2025). If the owner does not submit her intention to claim any surplus, the county may sell the property for the amount of the tax. Mich. Comp. Laws § 211.78m(1). If the owner does submit the form, the county has two options. It may (1) sell the property to itself or another county, city, or the state, for its fair market value, or (2) sell the property to the public through an auction. *Id.* § 211.78m(1)–(2). On the January following the sale, the county mails a notice to any owner who claimed an interest in the surplus. *Id.* § 211.78t(3)(i), (k). The notice informs owners of the "amount of any remaining proceeds" and tells them how to "file" "a motion" to claim the surplus in state court by the middle of May. *Id.* The county posts this two-page form online, too. At that point, the state court reviews the owners' motions and orders the county to pay them their surplus. *See id.* § 211.78t(9)–(10).

Howard never told the county that she intended to claim any surplus. *See id.* § 211.78t(2). As with the owners in *Nelson*, Howard failed to comply with the State's

procedures for collecting any surplus and, in doing so, forfeited her claim to it. *See* 352 U.S. at 110.

Howard resists this conclusion, first by contending that precedent allows her to recover directly from the county under the Takings Clause as opposed to collecting it under the Michigan law. Under *Knick v. Township of Scott*, 588 U.S. 180 (2019), as Howard reads it, she has no obligation to satisfy the requirements of the Michigan procedure. *Knick*, it is true, held that, when a State takes a citizen's property, she may file a claim for just compensation under 42 U.S.C. § 1983 without exhausting her right to seek compensation under state law. *Id.* at 191. But unlike the state laws at issue in *Knick*, Michigan's procedures for collecting the surplus do not compensate the property owner for a taking. They *prevent* a taking from happening in the first place. A county that allows property owners to obtain any surplus after a foreclosure and keeps the residual only if the owners do not seek it does not commit a taking. *See Nelson*, 352 U.S. at 110; *see also Tyler*, 598 U.S. at 644. Had Howard followed the Act's procedures for claiming the surplus, only to be denied it, then she could immediately bring a takings claim under § 1983. That is all that *Knick* guarantees.

Howard separately claims that *Knick* cut back on *Nelson*. But, as shown, the two cases address distinct issues. *Nelson* addressed whether state action caused a taking. *Knick* addressed the available remedies after a taking occurs. That explains why *Knick* never mentions *Nelson*. And it explains why *Tyler* relied on *Nelson* in explaining how to determine the existence of a taking. *See Tyler*, 598 U.S. at 643–45.

Howard persists that Michigan has no right to make these state-law, surplus-recovery procedures "exclusive"—to the exclusion, that is, of § 1983. But Howard sees conflict where there is harmony. By making these procedures "exclusive," the Michigan Legislature meant only to restrict owners' *state* remedies for seeking any surplus. *See Schafer v. Kent County*, – N.W.3d – , 2024 WL 3573500, at *19 (Mich. July 29, 2024).

*Bowles v. Sabree* does not alter this conclusion. 121 F.4th 539 (6th Cir. 2024). It merely observed that, under *Knick*, the legislature could not have meant more than to create an exclusive *state* procedure for recovering any surplus after a foreclosure sale. *See id.* at 555. *Bowles* did

not say or suggest that § 1983 preempted Michigan's procedures.  *See id.*  Instead of generating conflict with § 1983, Michigan's procedures prevent the State from violating the Takings Clause in the first instance.

Howard contends that Michigan should require the county to file a condemnation action to take her surplus instead of requiring her to initiate the process to claim it.  But neither *Nelson* nor *Tyler* imposes any such burden.

Howard maintains that this case parallels *Tyler* because the county kept the surplus after the foreclosure sale in both cases.  That comparison misses a crucial distinction between the Minnesota and Michigan procedures.  While Minnesota precluded owners from claiming any surplus, Michigan invites them to do so.  *See Tyler*, 598 U.S. at 639.  That tells us everything we need to know about how to satisfy the pertinent precedent:  *Nelson*.

Howard complains that Michigan's procedures contain hurdles apt to bar owners from recovering their just desserts.  She features two:  (1) that owners must submit a notice of their intent to claim the surplus before they know if a surplus exists, and (2) that they must file a post-sale motion that has many complex requirements.  But if that is the case, she should have brought a claim under the Due Process Clause of the Fourteenth Amendment.  No such claim appears in her complaint.  It is far from clear, at all events, that Michigan asks any more of property owners than New York City asked of them in seeking to recover these residuals.  *See Nelson*, 352 U.S. at 104 n.1, 110.  Howard certainly has not alleged that the Michigan procedures prohibit her from claiming the surplus or otherwise violate due process.

As for the pre-sale notice, moreover, Howard never explains why owners must know the amount of the surplus to know whether they want it.  This pre-sale notice, as in *Nelson*, benefits owners by allowing the county to hold a separate sale to yield any available surplus.  *See* Mich. Comp. Laws § 211.78m(1)–(2); *Nelson*, 352 U.S. at 105–06, 110.  As for the post-sale motion, the two-page, fill-in-the-blank form is do-it-yourself friendly, and the county sends owners detailed explanations about how and where to file it.  *See* Mich. Comp. Laws § 211.78t(3)(k).  If any questions remain, owners can visit the self-help center maintained by the county.  *Legal self-*

*help center*, www.macombgov.org/departments/16th-judicial-circuit-court/legal-self-help-center (last visited Mar. 27, 2025).

Howard claims that the Act fails to provide just compensation because it does not award interest and attorney's fees and subtracts a 5% sales commission from the surplus. Mich. Comp. Laws § 211.78t(9), (12)(b)(iii). But asking whether the Act provides just compensation is the wrong question. A county that complies with the Act by returning any surplus proceeds to the rightful owners when they claim it and keeps the surplus proceeds when they do not simply does not commit a taking. Absent a taking, the imperative of just compensation does not arise. *See Nelson*, 352 U.S. at 110.

The key question implicated by the 5% sales commission is not whether it deprives the owner of just compensation; it is whether the amount gives the State more than its due. It does not. Recall that *Nelson*, as well as the common law and statutory law before it, allows States to create procedures for owners to claim whatever is left from the foreclosure sale after the State satisfies the tax debt. Recall, too, that the States' authority to tax empowers them also to collect fees and the costs of conducting those procedures. *See Jones*, 547 U.S. at 234; *Tyler*, 598 U.S. at 638. Some of those costs—think of advertising the sale or determining (and enforcing) the winning bid after the foreclosure auction—will inure to the property owner's advantage by ensuring a successful sale and increasing the proceeds from it. Nothing in the complaint shows that this 5% commission is anything more than a reasonable fee to compensate the county for this real estate work or to incentivize the county to sell the property at the highest price possible.

The fee also finds company among historical and modern precedents. Several States and Territories permitted sales commissions when officers sold property to collect debts. *See, e.g.*, Digest of the State Laws of Ala., Taxes § 50 (1843) (allowing the collector to "demand and receive, from each delinquent whose property shall have been advertised, in addition to his other compensation for collecting the taxes, a commission of five per centum upon the amount raised"); Digest of the State Laws of Ga., Land, art. IV, § 100 (1851) (allowing the sheriff to "receive as compensation for his services five per cent. on the amount received"); Ohio Stat. ch. 244, § 42 (1833) (allowing the auditor to collect "four per cent." and the county or township to collect "six per cent. on all moneys wherewith he or they may stand charged"); Territory of Ariz.

Code ch. 57, § 9 (1871) (allowing sheriffs to impose a "five per cent" fee "for the first five thousand dollars" and a "three per cent" fee "for all above" that amount "for making the money upon execution").

Howard rejoins that the county already assesses fees and expenses actually incurred during the foreclosure sale in at least one other provision. *See* Mich. Comp. Laws § 211.78m(16)(c); *see also id.* § 211.78t(12)(b)(ii). As we understand it, Michigan charges some actual costs (e.g., for "legal" and "personnel" services, "auction expenses," and other costs "in connection with the forfeiture[ and] foreclosure") under two statutes. *See id.* §§ 211.78m(16)(c), 211.78t(12)(b)(ii). Then, on top of that, it charges 5% on each sale, to account for other costs in making these sales and to incentivize the county to aggressively seek the highest price. *See id.* § 211.78t(12)(b) ("'Remaining proceeds' means the amount equal to the difference between the amount paid to" the county for the property and the aggregation of the tax debt on the property, actual costs of the sale, and a "sale commission payable to the [county] equal to 5% of the amount paid to the [county] for the property").

To the extent Howard means to bring an as-applied challenge to the 5% charge, she is not in a strong position to do so given her choice not to exercise her rights under the state law. Having forfeited that option, we have little way of knowing what actually happened with respect to the sale of her property, and nothing in her complaint tries to fill that gap. A similar problem haunts Howard's claim about the lack of interest paid on the proceeds from the sale that would normally go to the property owner. It may be true, as Howard argues, that this statute does not provide interest. But because Howard did not invoke the statutory repayment scheme, there is no way to know whether the county itself provides interest on the payment or whether another Michigan statute would require interest on the payment.

To the extent Howard means to bring a facial challenge to the 5% fee, she has not shown that it would be unconstitutional in every setting. *See United States v. Salerno*, 481 U.S. 739, 745 (1987). There is nothing facially unconstitutional about accounting for some fees and costs in one provision and other types of fees and costs in another. Nor is Michigan an outlier. A survey of other state laws shows considerable, and reasonable, variation among the States in their approaches to defining and calculating fees and costs. *See, e.g.*, Utah Code Ann. § 59-2-

1351.1(7) (effective 2018) (calculating "tax notice charges, penalties, interest, and administrative costs"); Wis. Stat. Ann. § 75.36(3)(a) (effective 2024) (itemizing deductible costs, such as "reasonable and customary real estate agent or broker fees," as well as "interest, penalties, special assessments, special charges and special taxes"); Conn. Gen. Stat. Ann. § 12-157(c)–(d), (i) (effective 2015) (calculating the "interest, fees and other charges," including the costs of "auctioneers, clerks and other persons to assist the tax collector in the conduct of the sale" and "other charges allowed by law"); 44 R.I. Gen. Laws Ann. § 44-9-37 (effective 1956) (calculating "taxes, interest and charges," "together with the expenses of the sale"); Md. Code Ann., Tax-Prop. § 14-818(a)(4) (effective 2023) (calculating "interest, penalties, and costs of sale"). On this record, Michigan's 5% commission does not facially violate the Fifth Amendment.

For these reasons, we affirm.